**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| CLEARSIDE BIOMEDICAL, INC.,[1] | Case No. 25-12109 (TMH) |
| Debtor. | |

## DEBTOR'S COMBINED DISCLOSURE STATEMENT AND
## CHAPTER 11 PLAN OF LIQUIDATION

**RICHARDS, LAYTON & FINGER, P.A.**
Daniel J. DeFranceschi (No. 2732)
Michael J. Merchant (No. 3854)
Alexander R. Steiger (No. 7139)
One Rodney Square
920 N. King Street
Wilmington, Delaware 19801
Telephone:  (302) 651-7700
Emails:  defranceschi@rlf.com
         merchant@rlf.com
         steiger@rlf.com

*Co-Counsel to the Debtor
and Debtor in Possession*

**COOLEY LLP**
Daniel Shamah (admitted *pro hac vice*)
Lauren A. Reichardt (admitted *pro hac vice*)
Olya Antle (admitted *pro hac vice*)
Miriam Peguero Medrano (admitted *pro hac vice*)
55 Hudson Yards
New York, NY 10001-2157
Telephone:  (212) 479-6000
Emails: dshamah@cooley.com
        lreichardt@cooley.com
        oantle@cooley.com
        mpegueromedrano@cooley.com

*Co-Counsel to the Debtor
and Debtor in Possession*

Dated: January 5, 2026

---

[1] The Debtor and the last four digits of its taxpayer identification number are: Clearside Biomedical, Inc. (7375). The Debtor's mailing address is 900 North Point Parkway, Suite 200, Alpharetta, Georgia 30005.

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................3

II.     DEFINITIONS AND CONSTRUCTION OF TERMS...........................................3

    A.      Definitions.................................................................................................3

    B.      Interpretation; Application of Definitions and Rules of Construction..................14

III.    BACKGROUND ...................................................................................................15

    A.      General Background ................................................................................15

    B.      Circumstances Giving Rise to the Chapter 11 Case ...............................19

    C.      The Chapter 11 Case ...............................................................................21

IV.     SUMMARY OF TREATMENT OF CLAIMS AND EXISTING EQUITY INTERESTS AND ESTIMATED RECOVERIES........................................................25

    A.      Summary of Treatment of Claims and Existing Equity Interests and Estimated Recoveries ...............................................................................25

V.      TREATMENT OF UNCLASSIFIED CLAIMS...................................................26

    A.      Administrative Expense Bar Date...........................................................26

    B.      Administrative Expense Claims..............................................................26

    C.      Priority Tax Claims.................................................................................27

    D.      Professional Fee Claims..........................................................................27

    E.      Payment of Statutory Fees .....................................................................29

VI.     CLASSIFICATION OF CLAIMS AND Existing EQUITY INTERESTS; ESTIMATED RECOVERIES ...............................................................................29

VII.    TREATMENT OF CLAIMS AND EXISTING EQUITY INTERESTS ........................29

    A.      Treatment of Claims and Existing Equity Interests ...............................29

    B.      Modification of Treatment of Claims and Existing Equity Interests....................31

    C.      Cramdown and No Unfair Discrimination..............................................31

    D.      Reservation of Rights Regarding Claims................................................32

VIII.   EXECUTORY CONTRACTS AND UNEXPIRED LEASES.........................................32

    A.      Rejection of Executory Contracts and Unexpired Leases.......................32

B.      Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Combined Disclosure Statement and Plan ................................................................................................32

C.      Insurance Policies .................................................................................33

IX.     IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN .....................................................33

A.      Means for Implementation of this Combined Disclosure Statement and Plan ......33

X.      PROVISIONS REGARDING THE PLAN ADMINISTRATOR ....................................37

A.      Appointment of the Plan Administrator ..................................................37

B.      Rights and Powers of the Plan Administrator ..........................................37

C.      Post-Effective Date Expenses of the Plan Administrator ..........................37

D.      Plan Administrator Agreement ...............................................................38

XI.     PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN .................................................................38

A.      Method of Payment ...............................................................................38

B.      Objections to and Resolution of Claims and Existing Equity Interests ................38

C.      Claims or Existing Equity Interests Objection Deadline .........................38

D.      No Distribution Pending Allowance ......................................................38

E.      Reserve for Disputed Claims or Disputed Existing Equity Interests ....................39

F.      Timing of Distributions .........................................................................39

G.      Delivery of Distributions .......................................................................39

H.      Unclaimed Distributions .......................................................................40

I.      *De Minimis* Distributions .......................................................................40

J.      Setoff ....................................................................................................41

K.      Postpetition Interest ..............................................................................41

L.      Allocation of Distributions Between Principal and Interest ..................41

M.      No Holder to Receive More than Payment in Full .................................41

N.      Compliance with Tax Requirements ......................................................41

O.      Remaining Available Cash ....................................................................41

XII.    CONFIRMATION AND VOTING PROCEDURES .....................................................42

A.      Confirmation Procedure ........................................................................42

B.      Statutory Requirements for Confirmation .............................................43

XIII.   CONDITIONS TO THE EFFECTIVE DATE .................................................................45

|  | A. | Conditions Precedent to the Effective Date | 45 |
|  | B. | Establishing the Effective Date | 45 |
|  | C. | Effect of Failure of Conditions | 46 |
|  | D. | Waiver of Conditions to Confirmation and Effective Date | 46 |
| XIV. | | EXCULPATION, RELEASES and injunctions | 46 |
|  | A. | Exculpation | 46 |
|  | B. | Releases by the Debtor | 47 |
|  | C. | Injunctions Relating to Releases | 47 |
|  | D. | Injunctions to Protect Estate Assets | 48 |
| XV. | | ALTERNATIVES TO CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT and PLAN | 48 |
| XVI. | | CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES | 49 |
|  | A. | Brief Overview and Disclosure | 49 |
|  | B. | Consequences to the Debtor | 51 |
|  | C. | Consequences to Certain U.S. Holders of Allowed Claims | 51 |
|  | D. | Matters Related to the Disputed Claims Reserve | 53 |
|  | E. | Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims | 53 |
|  | F. | Information Reporting and Backup Withholding | 55 |
| XVII. | | RETENTION OF JURISDICTION | 56 |
| XVIII. | | MISCELLANEOUS PROVISIONS | 58 |
|  | A. | Books and Records | 58 |
|  | B. | Termination of Injunctions or Stays | 58 |
|  | C. | Amendment or Modification of this Combined Disclosure Statement and Plan | 58 |
|  | D. | Severability | 58 |
|  | E. | Revocation or Withdrawal of this Combined Disclosure Statement and Plan | 59 |
|  | F. | Binding Effect | 59 |
|  | G. | Notices | 59 |
|  | H. | Governing Law | 59 |
|  | I. | Withholding and Reporting Requirements | 59 |
|  | J. | 2002 Service List | 60 |
|  | K. | Headings | 60 |

L.      Exhibits/Schedules ................................................................................60

M.      Filing of Additional Documents ...........................................................60

N.      No Admissions ........................................................................................60

O.      Successors and Assigns..........................................................................60

P.      Reservation of Rights.............................................................................61

Q.      Implementation .......................................................................................61

R.      Inconsistency...........................................................................................61

S.      Dissolution of Debtor.............................................................................61

T.      Termination of the Plan Administrator ................................................61

U.      Request for Expedited Determination of Taxes...................................61

THIS COMBINED DISCLOSURE STATEMENT AND PLAN CONTAINS CERTAIN STATUTORY PROVISIONS AND DESCRIBES CERTAIN EVENTS IN THIS CHAPTER 11 CASE AND CERTAIN DOCUMENTS RELATED TO THE COMBINED DISCLOSURE STATEMENT AND PLAN THAT MAY BE ATTACHED AND ARE INCORPORATED BY REFERENCE.  ALTHOUGH THE DEBTOR BELIEVES THAT THIS INFORMATION IS FAIR AND ACCURATE, THIS INFORMATION IS QUALIFIED IN ITS ENTIRETY TO THE EXTENT THAT IT DOES NOT SET FORTH THE ENTIRE TEXT OF SUCH DOCUMENTS OR STATUTORY PROVISIONS OR EVERY DETAIL OF SUCH EVENTS.

THE INFORMATION CONTAINED HEREIN OR ATTACHED HERETO IS MADE ONLY AS OF THE DATE OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN, UNLESS ANOTHER TIME IS SPECIFIED.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN WAS COMPILED FROM INFORMATION OBTAINED FROM NUMEROUS SOURCES BELIEVED TO BE ACCURATE TO THE BEST OF THE DEBTOR'S KNOWLEDGE, INFORMATION AND BELIEF.  THERE CAN BE NO ASSURANCES THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THIS DATE.

NO REPRESENTATIONS OR WARRANTIES ARE MADE AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR ASSUMPTIONS REGARDING THE DEBTOR'S BUSINESS.  EXCEPT WHERE SPECIFICALLY NOTED, THE FINANCIAL INFORMATION CONTAINED IN THIS COMBINED DISCLOSURE STATEMENT AND PLAN AND IN THE RELATED EXHIBITS HAS NOT BEEN AUDITED BY A CERTIFIED PUBLIC ACCOUNTANT AND HAS NOT BEEN PREPARED IN ACCORDANCE WITH GENERALLY ACCEPTED ACCOUNTING PRINCIPLES IN THE UNITED STATES OR ANY OTHER JURISDICTION.

THIS DISCLOSURE STATEMENT AND PLAN HAS BEEN PREPARED IN ACCORDANCE WITH SECTIONS 1123 AND 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016 AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER NON-BANKRUPTCY LAWS.  THIS COMBINED DISCLOSURE STATEMENT AND PLAN HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION, NOR HAS THE SEC, ANY STATE SECURITIES COMMISSION OR ANY SECURITIES EXCHANGE OR ASSOCIATION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  NO OTHER GOVERNMENTAL OR OTHER REGULATORY AUTHORITY HAS PASSED ON, CONFIRMED OR DETERMINED THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN.

NOTHING STATED HEREIN SHALL BE DEEMED OR CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTOR OR ANY OTHER PARTY, OR BE DEEMED CONCLUSIVE EVIDENCE OF THE TAX OR OTHER LEGAL EFFECTS OF THE COMBINED DISCLOSURE STATEMENT AND PLAN ON THE DEBTOR OR HOLDERS OF CLAIMS OR INTERESTS.  CERTAIN STATEMENTS CONTAINED HEREIN, BY NATURE,

ARE FORWARD-LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL REFLECT ACTUAL OUTCOMES.

HOLDERS OF CLAIMS AND INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL OR TAX ADVICE. THEREFORE, EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL AND TAX ADVISORS AS TO ANY SUCH MATTERS CONCERNING THE COMBINED DISCLOSURE STATEMENT AND PLAN AND THE TRANSACTIONS CONTEMPLATED HEREBY.

RLF1 34494424v.1

## I.    INTRODUCTION[2]

The Debtor hereby proposes this Combined Disclosure Statement and Plan pursuant to sections 1125 and 1129 of the Bankruptcy Code. The Debtor is the proponent of this Combined Disclosure Statement and Plan within the meaning of section 1129 of the Bankruptcy Code.

This Combined Disclosure Statement and Plan constitutes a liquidating chapter 11 plan. Except as otherwise provided by an Order of the Bankruptcy Court, Distributions will occur on the Effective Date or as soon thereafter practicable and in accordance with this Combined Disclosure Statement and Plan. The Debtor will be dissolved under applicable law as soon as practicable upon the closing of the Chapter 11 Case.

Subject to the restrictions on modifications set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019 and those restrictions on modifications set forth in Article XVIII.C of this Combined Disclosure Statement and Plan, the Debtor expressly reserves the right to alter, amend or modify this Combined Disclosure Statement and Plan before its substantial consummation.

## II.    DEFINITIONS AND CONSTRUCTION OF TERMS

### A.    Definitions

As used herein, the following terms have the respective meanings specified below, unless the context otherwise requires:

1.    "**503(b)(9) Claim**" means any Claim against the Debtor under section 503(b)(9) of the Bankruptcy Code for the value of goods sold to the Debtor in the ordinary course of business and received by the Debtor within twenty (20) days before the Petition Date.

2.    "**Ad Hoc Group**" has the meaning set forth in Article III.C.3.

3.    "**Additional Consideration**" has the meaning set forth in Article III.A.2.a.

4.    "**Additional Transferred Assets**" has the meaning set forth in Article III.A.2.a.

5.    "**Administrative Expense Bar Date**" means the date by which a request for payment of an Administrative Expense Claim must be Filed and is thirty (30) days after the Effective Date; *provided that* in accordance with the Bar Date Order, 503(b)(9) Claims shall be subject to the General Bar Date.

6.    "**Administrative Expense Claim**" means a Claim against the Debtor or its Estate for costs or expenses of administration of the Estate pursuant to sections 364(c)(1), 503(b), 503(c), 507(b) or 1114(e)(2) of the Bankruptcy Code, including: (a) the actual and necessary costs and expenses incurred after the Petition Date and through the Effective Date of preserving the Estate

---

[2] All capitalized terms not defined in this introduction shall have the same meanings set forth in Article II of this Combined Disclosure Statement and Plan.

and operating the business of the Debtor; (b) compensation for legal, financial advisory, accounting and other services and reimbursement of expenses awarded or Allowed under sections 330(a) or 331 of the Bankruptcy Code, including Professional Fee Claims; and (c) all fees and charges assessed against the Estate under chapter 123 of title 28 of the United States Code, 28 U.S.C. sections 1911-1930.

7. **"Administrative Expense Claim Objection Deadline"** means the date that is no later than thirty (30) days after the later of the Effective Date and any Filing of any Administrative Expense Claim or Filing of any request for payment of Administrative Expense Claim, unless such objection deadline is extended by Order of the Bankruptcy Court upon the motion of the Plan Administrator or by agreement between the Plan Administrator and the Person or Entity that Filed the Administrative Expense Claim solely with respect to such Administrative Expense Claim.

8. **"Affiliate"** has the meaning set forth in section 101(2) of the Bankruptcy Code. With respect to any Person that is not a Debtor, the term "Affiliate" shall apply to such Person as if the Person were the Debtor.

9. **"Allowed"** means, (a) with respect to any Claim, a Claim that is not a Disputed Claim or a Disallowed Claim; *provided*, *however*, that a Disputed Claim shall become an Allowed Claim to the extent (i) no objection to such Claim has been interposed by the Claims Objection Deadline or the Administrative Expense Claim Objection Deadline, as applicable, or such other period fixed by the Bankruptcy Court, (ii) an objection to such Claim has been interposed, but withdrawn or overruled by a Final Order and the Debtor has no right to object to such Claim on other grounds, or (iii) the Bankruptcy Court enters a Final Order providing that such Claim is an Allowed Claim; and (b) with respect to Existing Equity Interests, (i) any Existing Equity Interest that is Allowed pursuant to this Combined Disclosure Statement and Plan; or (ii) any other Existing Equity Interest that has been Allowed by an Order of the Bankruptcy Court.

10. **"Amended PSA"** has the meaning set forth in Article III.A.2.a.

11. **"Amended Schedules Bar Date"** has the meaning set forth in Article III.C.5.c.

12. **"Appointment Motion"** means the *Motion for an Order Directing the U.S. Trustee to Appoint an Official Committee of Equity Holders Pursuant to 11 U.S.C. § 1102* [Docket No. 116 (sealed); Docket No. 124 (redacted)].

13. **"Assets"** means all of the assets of the Debtor of any nature whatsoever, including, without limitation, all property of the Estate pursuant to section 541 of the Bankruptcy Code, Cash (including proceeds from the Sale Transaction), Causes of Action, accounts receivable, tax refunds, claims of right, interests and property, real and personal, tangible and intangible, and the proceeds of all of the foregoing.

14. **"Avoidance Actions"** means all avoidance and recovery actions or remedies that may be brought on behalf of the Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies under sections 544, 547, 548, 550, 551, 552, or 553 of the Bankruptcy Code.

15.      **"Bankruptcy Code"** means title 11 of the United States Code, 11 U.S.C. sections 101-1532, as amended from time to time.

16.      **"Bankruptcy Court"** means the United States Bankruptcy Court for the District of Delaware.

17.      **"Bankruptcy Exception"** has the meaning set forth in Article XVI.B.

18.      **"Bankruptcy Rules"** means the Federal Rules of Bankruptcy Procedure, as amended from time to time.

19.      **"Bar Date Order"** means the *Order (I) Establishing Bar Dates and Related Procedures for Filing Proofs of Claim, Including Section 503(b)(9) Claims, and (II) Approving the Form and Manner of Notice Thereof* [Docket No. 141].

20.      **"Bidding Procedures"** has the meaning set forth in Article III.C.4.

21.      **"Bidding Procedures Motion"** means the *Debtor's Motion for Entry of Orders (I)(A) Approving the Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Designate the Stalking Horse Bidder and Provide Bid Protections (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (D) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtor's Assets Free and Clear Of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 50].

22.      **"Bidding Procedures Order"** means the *Order (I)(A) Approving the Bidding Procedures for the Sale of the Debtor's Assets, (B) Authorizing the Debtor to Designate the Stalking Horse Bidder and Provide Bid Protections (C) Scheduling an Auction and Sale Hearing and Approving the Form and Manner of Notice Thereof, and (D) Approving Assumption and Assignment Procedures; (II)(A) Approving the Sale of the Debtor's Assets Free and Clear Of Liens, Claims, Interests, and Encumbrances and (B) Approving the Assumption and Assignment of Executory Contracts and Unexpired Leases; and (III) Granting Related Relief* [Docket No. 92].

23.      **"Board"** means the board of directors of Clearside Biomedical, Inc.

24.      **"BRG"** means Berkeley Research Group, LLC.

25.      **"Business Day"** means any day other than a Saturday, Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

26.      **"Cap"** has the meaning set forth in Article III.A.2.a.

27.      **"Cash"** means legal tender of the United States of America and equivalents thereof.

28.      **"Causes of Action"** means the Avoidance Actions, all Claims, and all other claims, actions, causes of action, choses in action, suits, debts, dues, sums of money, accounts, reckonings,

bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, third-party claims, counterclaims, and crossclaims, whether in contract or in tort, whether arising under the Bankruptcy Code or other federal or state law, or based in equity, or pursuant to any other theory of law, including, but not limited to, under the Bankruptcy Code or securities law, whether direct, indirect, derivative, or otherwise, whether asserted or unasserted, known or unknown, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, and any and all commercial tort claims against any party, in each case, whether arising before, on or after the Petition Date.

29.     **"Chapter 11 Case"** means the case under chapter 11 of the Bankruptcy Code commenced by the Debtor, styled as Clearside Biomedical, Inc., under Case No. 25-12109 (TMH), currently pending in the Bankruptcy Court.

30.     **"Claim"** has the meaning set forth in section 101(5) of the Bankruptcy Code.

31.     **"Claims and Noticing Agent"** means Epiq Corporate Restructuring, LLC.

32.     **"Claims or Existing Equity Interests Objection Deadline"** means, subject to any extension as set forth in Article XI.C of this Combined Disclosure Statement and Plan, the date that is the first Business Day that is one hundred eighty (180) days after the Effective Date; *provided that* for Administrative Expense Claims, such deadline shall be the Administrative Expense Claim Objection Deadline. For the avoidance of doubt, the Claims or Existing Equity Interests Objection Deadline may be extended by the Bankruptcy Court.

33.     **"Class"** means any group of substantially similar Claims or Equity Interests classified by this Combined Disclosure Statement and Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

34.     **"Clearside Royalty"** means Clearside Royalty LLC.

35.     **"CODI"** has the meaning set forth in Article XVI.B.

36.     **"Combined Disclosure Statement and Plan"** means this combined disclosure statement and chapter 11 plan of liquidation, including, without limitation, the Plan Supplement, all exhibits, supplements, appendices and schedules hereto, either in their present form or as the same may be altered, amended or modified from time to time in accordance with the terms hereof.

37.     **"Combined Notice"** has the meaning set forth in Article XII.A.1.

38.     **"Completion Payments"** means the one-time cash payment of $861,840 to the Debtor's Chief Executive Officer and $633,525 to the Debtor's Chief Financial Officer, contemplated under their respective consulting agreements with the Debtor and payable if each of the foregoing (i) continues to provide services under their respective consulting agreement with the Debtor through consummation of a change in control or a similar transaction involving a sale, transfer, or other disposition of the Debtor's Assets, and (ii) has not received an offer of employment from any acquiror on substantially similar terms as the terms of their respective prior employment agreements with Clearside Biomedical, Inc.

6

39.    **"Confirmation Date"** means the date on which the Confirmation Order is entered on the Docket.

40.    **"Confirmation Hearing"** means the hearing held by the Bankruptcy Court to consider (i) approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of this Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code, as such hearing may be adjourned or continued from time to time.

41.    **"Confirmation Order"** means the Order of the Bankruptcy Court confirming this Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.

42.    **"Consulting Period"** means the term of service under the consulting agreements between the Debtor and Officer Parties, which commenced on July 18, 2025, and continues until the earlier of (i) consummation of a change in control or a similar transaction involving a sale, transfer, or other disposition of the Debtor's Assets, and (ii) December 31, 2025, subject to extension on a month-to-month basis by the Debtor in its sole discretion and further extension or early termination by written agreement of the parties.

43.    "**Contributed Assets**" has the meaning set forth in Article III.A.2.a.

44.    **"Contribution"** has the meaning set forth in Article III.A.2.a.

45.    "**Contribution Agreement**" has the meaning set forth in Article III.A.2.a.

46.    **"Creditor"** means any Person that is the Holder of a Claim against the Debtor.

47.    **"Debtor"** means Clearside Biomedical, Inc.

48.    **"Disallowed"** means (a) with respect to Claims: any Claim or any portion thereof that (i) has been disallowed by a Final Order, (ii) appears on the Schedules as zero or as contingent, disputed or unliquidated and as to which no proof of Claim has been Filed or deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Final Order or otherwise deemed Filed under applicable law or this Combined Disclosure Statement and Plan, (iii) is not on the Schedules and as to which no proof of Claim has been deemed Filed with the Bankruptcy Court pursuant to either the Bankruptcy Code or any Order or otherwise deemed Filed under applicable law or this Combined Disclosure Statement and Plan, (iv) has been withdrawn by agreement of the Debtor and the Holder thereof or (v) has been withdrawn by the Holder thereof, and (b) with respect to Existing Equity Interests: any Existing Equity Interest or any portion thereof that has been disallowed by a Final Order.

49.    **"Disputed"** means, with respect to any Claim or Existing Equity Interest, any Claim or Existing Equity Interest that is not yet Allowed and has not yet been disallowed by an Order of the Bankruptcy Court.  For the avoidance of doubt, any Claim or Existing Equity Interest, in whole or in part, that is subject to a pending objection to the Allowance of such Claim shall be considered a Disputed Claim in its entirety until that objection has been resolved by Order of the Bankruptcy Court.

50.     **"Distribution"** means any distribution to the Holders of Allowed Claims or Existing Equity Interests.

51.     **"Distribution Date"** means any date on which a Distribution is made to Holders of Allowed Claims and Existing Equity Interests under this Combined Disclosure Statement and Plan, or as otherwise agreed.  The initial Distributions shall occur on or as soon as practicable after the Effective Date or as otherwise agreed by the Plan Administrator.  To the extent subsequent Distributions are necessary, such subsequent Distributions shall occur as soon after the first Distribution Date as the Plan Administrator shall determine in accordance with the Plan Administrator Agreement.

52.     **"Docket"** means the docket in the Chapter 11 Case maintained by the clerk of the Bankruptcy Court.

53.     **"D&O Insurance Policies"** means any insurance policy, including any tail policies, providing insurance and/or similar coverage to a current or former officer, director or employee of the Debtor.

54.     **"DTC"** has the meaning set forth in Article XI.G.1.

55.     **"Effective Date"** means the date on which all conditions to the effectiveness of this Combined Disclosure Statement and Plan set forth in Article XIII.B of this Combined Disclosure Statement and Plan have been satisfied or waived in accordance with the terms of this Combined Disclosure Statement and Plan.

56.     **"Emory and GT License Agreement"** has the meaning set forth in Article III.A.2.b.

57.     **"Entity"** means an entity as defined in section 101(15) of the Bankruptcy Code.

58.     **"Equity Interest"** means any common stock, limited liability company interest, equity security (as defined in section 101(16) of the Bankruptcy Code), equity, ownership, profit interests, unit, or share in the Debtor (including all issued, unissued, authorized, or outstanding shares of capital stock of the Debtor and any other rights, options, warrants, stock appreciation rights, phantom stock rights, restricted stock units, redemption rights, repurchase rights, convertible, exercisable, or exchangeable securities or other agreements, arrangements or commitments of any character relating to, or whose value is related to, any such interest or other ownership interest in the Debtor), whether or not arising under or in connection with any employment agreement and whether or not certificated, transferable, preferred, common, voting, or denominated "stock" or a similar security.

59.     **"Estate"** means the estate of the Debtor created upon the commencement of the Chapter 11 Case pursuant to section 541 of the Bankruptcy Code.

60.     **"Exculpated Parties"** means the following, each in their respective capacities as such, (a) the Debtor and (b) the Related Parties of the Debtor, in each case as to the Persons and Entities in this clause (b) to the extent such Person or Entity is a fiduciary of the Estate (including, without limitation, as an officer or director of the Debtor).

61.     **"Executory Contract"** means any executory contract as of the Petition Date between the Debtor and any other Person or Entity.

62.     **"Existing Equity Interests"** means all Equity Interests in the Debtor including, but not limited to, all issued, unissued, authorized or outstanding shares or membership interests together with any warrants, options or contract rights to purchase or acquire such interests.

63.     **"File"**, "**Filed**", or "**Filing**" means file, filed, or filing with the Bankruptcy Court in the Chapter 11 Case.

64.     **"Final Order"** means an Order of the Bankruptcy Court or a court of competent jurisdiction to hear appeals from the Bankruptcy Court, that has not been reversed, stayed, modified or amended and as to which the time to appeal, to petition for certiorari, or to move for reargument or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for reargument or rehearing shall then be pending; *provided that* even if an appeal, petition for certiorari, or other proceedings for reargument or rehearing are timely Filed, an Order will be deemed a Final Order if it provides that it is effective immediately upon entry on the Docket and not subject to any stay notwithstanding the provisions of Bankruptcy Rules 6004(h), 6006(d), 7062, and Rule 62 of the Federal Rules of Civil Procedure, and that no stay pending appeal has been obtained.

65.     **"First Day Declaration"** means the *Declaration of George Lasezkay in Support of Chapter 11 Petition and First Day Motions* [Docket No. 2].

66.     **"General Bar Date"** means January 26, 2026, at 11:59 p.m., prevailing Eastern Time, pursuant to the Bar Date Order.

67.     **"General Unsecured Claim"** means any Claim against the Debtor that (a) is unpaid as of the Effective Date, and (b) arose or is deemed by the Bankruptcy Code or Bankruptcy Court, as the case may be, to have arisen before the Petition Date and that is not an Administrative Expense Claim, Priority Tax Claim, Secured Claim, or Priority Non-Tax Claim.

68.     **"Gerresheimer"** means Gerresheimer Regensburg GmbH.

69.     **"Gerresheimer Supply Agreement"** has the meaning set forth in Article III.A.2.c.

70.     **"Governmental Bar Date"** means May 22, 2026, at 11:59 p.m., prevailing Eastern Time, pursuant to the Bar Date Order.

71.     **"Governmental Unit"** has the meaning set forth in section 101(27) of the Bankruptcy Code.

72.     "**HCR**" means HealthCare Royalty Management, LLC or entities managed by HealthCare Royalty Management, LLC.

73.     **"Holder"** means the beneficial holder of any Claim or Equity Interest.

74.     **"Impaired"** means, with respect to a Class of Claims or Equity Interests, a Claim or an Equity Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

75.     **"Insurance Policies"** means any and all insurance policies, insurance settlement agreements, coverage-in-place agreements, and other agreements, documents, or instruments relating to the provisions of insurance entered into by or issued to or for the benefit of, at any time, the Debtor or its predecessors (including, for the avoidance of doubt, any such policies, agreements, or other documents that have been paid in full).

76.     **"Insurer"** means any Person or Entity that issued an Insurance Policy, any third-party administrator of or for any Insurance Policy, and any respective predecessors and/or Affiliates of any of the foregoing.

77.     **"Interim Compensation Order"** means the *Order (I) Establishing Procedures for Interim Compensation and Reimbursement of Professionals, and (II) Granting Related Relief* [Docket No. 142].

78.     **"Investment Amount"** has the meaning set forth in Article III.A.2.a.

79.     **"IPO"** has the meaning set forth in Article III.A.1.

80.     "**IRC**" has the meaning set forth in Article XVI.A.

81.     "**IRS**" has the meaning set forth in Article XVI.A.

82.     **"Liabilities"** means any and all Claims, obligations, suits, judgments, damages, demands, debts, rights, Causes of Action, and liabilities, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, arising in law, equity or otherwise, that are based in whole or in part on any act, event, injury, omission, transaction or agreement.

83.     **"Lien"** has the meaning set forth in section 101(37) of the Bankruptcy Code.

84.     **"Nasdaq"** has the meaning set forth in Article III.A.7.

85.     **"Net Distributable Assets"** means the gross amount available from the liquidation of the Assets, including the proceeds from the Sale Transaction, net of the amount of (i) Statutory Fees and (ii) Allowed Claims, including Allowed Professional Fee Claims and Allowed Priority Tax Claims.

86.     **"NOLs"** has the meaning set forth in Article III.C.6.

87.     **"NOL Motion"** means the *Debtor's Motion for Entry of Interim and Final Orders (I) Establishing Notice and Objection Procedures for Transfers of Equity Securities, (II) Establishing a Record Date for Notice and Sell-Down Procedures for Trading in Claims Against the Debtor's Estate, and (III) Granting Related Relief* (the "NOL Motion") [Docket No. 68].

88.     **"Non-U.S. Holder"** has the meaning set forth in Article XVI.A.

89.     "**Notice of Non-Voting Status**" has the meaning set forth in Article XII.A.1.

90.     "**Officer Parties**" means, collectively, the Debtor's Chief Executive Officer and Chief Financial Officer, each in their capacity as officers of the Debtor and parties to the Officer Settlement Agreement.

91.     "**Officer Settlement Agreement**" means the agreement incorporated into Article IX.A.5 of this Combined Disclosure Statement and Plan, providing for settlement of any Claims or causes of action against the Debtor by the Officer Parties.

92.     "**OID**" has the meaning set forth in Article XVI.C.2.

93.     "**Omnibus Amendment Agreement**" has the meaning set forth in Article III.A.2.a.

94.     "**Order**" means an order or judgment of the Bankruptcy Court as entered on the Docket.

95.     "**Person**" has the meaning set forth in section 101(41) of the Bankruptcy Code.

96.     "**Petition Date**" means November 23, 2025.

97.     "**Piper**" means Piper Sandler & Co.

98.     "**Plan Administrator**" means a Person selected by the Debtor to effectuate the provisions of this Combined Disclosure Statement and Plan after the Effective Date.  The identity, role, and compensation of the Plan Administrator will be disclosed in the Plan Supplement.

99.     "**Plan Administrator Agreement**" means the agreement between the Debtor and the Plan Administrator, as the same may be amended from time to time in accordance with its terms, Filed as part of the Plan Supplement and approved pursuant to the Confirmation Order.

100.    "**Plan Supplement**" means the documents, schedules, and any exhibits Filed prior to the Confirmation Hearing, as amended, supplemented or modified from time to time, including the form of the Plan Administrator Agreement.

101.    "**Post-Effective Date Debtor**" means the Debtor, from and after the Effective Date.

102.    "**Priority Non-Tax Claim**" means a Claim that is accorded priority in right of payment under section 507 of the Bankruptcy Code, other than a Priority Tax Claim or an Administrative Expense Claim.

103.    "**Priority Tax Claim**" means a Claim that is entitled to priority under section 507(a)(8) of the Bankruptcy Code.

104.    "**Procedures Order**" has the meaning set forth in Article XII.A.1.

11

105.    **"Professional"** means any professional person employed in the Chapter 11 Case pursuant to section 327, 328 or 1103 of the Bankruptcy Code pursuant to an Order of the Bankruptcy Court and to be compensated for services rendered pursuant to sections 327, 328, 329, 330, or 331 of the Bankruptcy Code.

106.    **"Professional Fee Claims"** means all Claims under sections 330, 331, 503, or 1103 of the Bankruptcy Code for compensation and reimbursement of expenses by Professionals.

107.    **"Professional Fee Claims Objection Deadline"** has the meaning set forth in Article V.D.4.

108.    **"Professional Fee Escrow Amount"** means the reasonable estimate of the aggregate amount of Allowed Professional Fee Claims relating to the period prior to the Effective Date, which estimates Professionals shall deliver to the Debtor as set forth in Article V.D.2 of this Combined Disclosure Statement and Plan.

109.    **"Professional Fee Reserve"** means an account funded by the Debtor with Cash from the Assets as soon as possible after confirmation and not later than the Effective Date in an amount equal to the Professional Fee Escrow Amount.

110.    **"Pro Rata"** means, when used with reference to a distribution of property to Holders of Allowed Claims or Allowed Existing Equity Interests, in a particular Class or any other specified group of Claims or Existing Equity Interests pursuant to this Combined Disclosure Statement and Plan, proportionately, so that with respect to a particular Allowed Claim or Allowed Existing Equity Interest in such Class or in such group, the ratio of the amount of property to be distributed on account of such Claim or Existing Equity Interest, to the amount of such Claim or Existing Equity Interest, is the same as the ratio of the amount of property to be distributed on account of all Allowed Claims or Allowed Existing Equity Interests, in such Class or group of Claims or Existing Equity Interests to the amount of all Allowed Claims or Allowed Existing Equity Interests in such Class or group of Claims or Existing Equity Interests.  Until all Disputed Claims and Disputed Existing Equity Interests in a Class are resolved, Disputed Claims or Disputed Existing Equity Interests shall be treated as Allowed Claims and Existing Equity Interests in their face amount for purposes of calculating Pro Rata distribution of property to Holders of Allowed Claims or Allowed Existing Equity Interests, in such Class.

111.    **"PSA"** has the meaning set forth in Article III.A.2.a.

112.    **"Purchase Agreement"** means the asset purchase agreement or similar agreement in connection with the Sale Transaction, pursuant to which any potential Purchaser agrees to acquire the Debtor's Assets.

113.    **"Purchased Royalties"** has the meaning set forth in Article III.A.2.a.

114.    **"Purchaser"** means the entity or entities that are party to the Purchase Agreement in connection with the Sale Transaction.

115.    **"Rejection Damages Bar Date"** has the meaning set forth in Article III.C.5.c.

116.    **"Related Parties"** means, with respect to any (w) Person or Entity, (x) such Person's or Entity's predecessors, successors, and assigns, (y) with respect to each of the foregoing in clauses (w) and (x), such Person's or Entity's respective current and former direct or indirect stockholders, members, limited partners, general partners, equity holders, principals, directors, officers, managers, employees, consultants (who, in the case of the Debtor, transitioned from employee to consultant status on or after July 17, 2025), agents, designees, trustees, advisory board members, attorneys, financial advisors, investment bankers, accountants, and other professionals or representatives, and any other fiduciaries to such Person or Entity with any involvement related to the Debtor, and (z) with respect to each of the foregoing in clauses (w)-(y), such Person's or Entity's respective heirs, executors, estates, and nominees.

117.    **"Released Parties"** means the following Entities, each in their capacity as such: (a) the Debtor and (b) the Related Parties of the Debtor.

118.    **"Sale Order"** means the Order of the Bankruptcy Court authorizing the Sale Transaction pursuant to sections 363 and 365 of the Bankruptcy Code and in accordance with the Purchase Agreement.

119.    **"Sale Transaction"** means the sale of the Debtor's Assets pursuant to the Purchase Agreement and the Sale Order.  The Sale Transaction may constitute (a) one transaction for substantially all Assets of the Debtor or (b) multiple transactions for subsets of Assets of the Debtor.

120.    **"Schedules"** means, collectively, the schedules of Assets and liabilities, schedule of Executory Contracts and Unexpired Leases and statement of financial affairs Filed by the Debtor pursuant to section 521 of the Bankruptcy Code, the Bankruptcy Rules, and the official bankruptcy forms, as the same may be amended, modified, or supplemented from time to time [Docket Nos. 47, 48].

121.    **"SEC"** means the U.S. Securities and Exchange Commission.

122.    **"Secured Claim"** means a Claim that is secured by a Lien on property in which the Estate has an interest, which Lien is valid, perfected, and enforceable pursuant to applicable law or by reason of a Final Order of the Bankruptcy Court, or that is subject to a valid right of setoff pursuant to section 553 of the Bankruptcy Code, to the extent of the value of the Holder of such Claim's interest in the Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) or as Allowed pursuant to this Combined Disclosure Statement and Plan as a Secured Claim.

123.    **"Security Agreement"** has the meaning set forth in Article III.A.2.a.

124.    **"Settlement Payments"** means the payments of $136,800 to the Debtor's Chief Executive Officer and $105,318 to the Debtor's Chief Financial Officer in full and final satisfaction, settlement, release, and discharge of any and all Claims, causes of action, rights, or entitlements of the Officer Parties against the Debtor, including for the Completion Payments under their respective consulting agreements with the Debtor and any related Claims or causes of action under the Bankruptcy Code or applicable law, as further set forth in Article IX.A.5.

13

125.    **"Stalking Horse Bid"** has the meaning set forth in <u>Article III.C.4</u>.

126.    **"Stalking Horse Bidder"** means Health Ocean Pharma (Eye) Limited.

127.    **"Statutory Fees"** means any fees due and payable pursuant to section 1930 of title 28 of the United States Code.

128.    **"Strategic Committee"** means the Strategic Committee of the Board.

129.    **"Successful Bidder"** has the meaning set forth in the Bidding Procedures.

130.    "**Treasury Regulations**" has the meaning set forth in <u>Article XVI.A</u>.

131.    **"Unclaimed Distribution"** means a Distribution that is not claimed by a Holder of an Allowed Claim on or prior to the Unclaimed Distribution Deadline.

132.    **"Unclaimed Distribution Deadline"** means one hundred and twenty (120) days from the date the Plan Administrator makes a Distribution of Cash or other property under this Combined Disclosure Statement and Plan to a Holder of an Allowed Claim or Existing Equity Interest.

133.    **"Unexpired Lease"** means a lease to which the Debtor is a party as of the Petition Date and which is subject to assumption or rejection under section 365 of the Bankruptcy Code.

134.    **"United States Trustee"** means the Office of the United States Trustee for the District of Delaware.

135.    **"U.S. Holder"** has the meaning set forth in <u>Article XVI.A</u>.

**B.    <u>Interpretation; Application of Definitions and Rules of Construction</u>**

Wherever from the context it appears appropriate, each term stated in either the singular or the plural shall include both the singular and the plural and pronouns stated in the masculine, feminine or neuter gender shall include the masculine, feminine and neuter.  Unless otherwise specified, all section, article, schedule or exhibit references in this Combined Disclosure Statement and Plan are to the respective section in, Article of, Schedule to, or Exhibit to this Combined Disclosure Statement and Plan.  The words "herein," "hereof," "hereto," "hereunder" and other words of similar import refer to this Combined Disclosure Statement and Plan as a whole and not to any particular section, subsection or clause contained in this Combined Disclosure Statement and Plan.  The rules of construction contained in section 102 of the Bankruptcy Code shall apply to the construction of this Combined Disclosure Statement and Plan.  A term used herein that is not defined herein, but that is used in the Bankruptcy Code, shall have the meaning ascribed to that term in the Bankruptcy Code.  The headings in this Combined Disclosure Statement and Plan are for convenience of reference only and shall not limit or otherwise affect the provisions of this Combined Disclosure Statement and Plan.

### III.    BACKGROUND

On the Petition Date, the Debtor Filed a voluntary petition for relief pursuant to chapter 11 of the Bankruptcy Code and, since that date, has operated as debtor-in-possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

### A.    General Background[3]

#### 1.    The Debtor's Business as of the Petition Date

The Debtor is a clinical-stage biopharmaceutical company focused on developing and commercializing innovative therapies to treat serious eye diseases.  In addition to its clinical programs, the Debtor is advancing a portfolio of preclinical small molecule candidates aimed at expanding its therapeutic reach.

The Debtor's core technology is its proprietary suprachoroidal space (SCS®) injection platform, which enables targeted, non-surgical delivery of drugs to the back of the eye using a specialized medical device called an SCS Microinjector®.  As further described below, this approach allows for the placement of medicine into a narrow area between the white outer layer of the eye (sclera) and the layer of blood vessels underneath (choroid) called the suprachoroidal space, ensuring the treatment can work more effectively while reducing the chances of side effects in other parts of the eye or the rest of the body.

The Debtor's business model integrates internal product development with strategic partnerships, allowing the company to pursue both near-term market opportunities and long-term market innovation for next generation therapies.  The Debtor has successfully commercialized its first FDA-approved product and has built a pipeline of clinical and pre-clinical candidates leveraging the SCS Microinjector technology.   The Debtor collaborates with leading pharmaceutical and biotechnology companies to expand the application of its platform across a range of ophthalmic indications, including inflammation, neovascular disorders, and eye cancers. Specifically, the Debtor has partnered with companies such as Bausch + Lomb for the commercialization of its first FDA-approved product, XIPERE, in North America, and with Arctic Vision in China and selected Asia-Pacific markets (with its commercialization partner Santen Pharmaceutical Co. Ltd., the leading ophthalmology company in Japan), while other partners—REGENXBIO Inc. (with its commercialization partner, AbbVie Inc., a global biopharmaceutical company), Aura Biosciences, Inc. and BioCryst Pharmaceuticals Inc.—are using the SCS Microinjector in late-stage programs for gene therapy, ocular oncology and diabetic macular edema, respectively.

Between May 2011 and June 2016, the Debtor operated as a private company funded primarily through convertible preferred equity and debt, while advancing a series of clinical programs designed to demonstrate the safety and efficacy of its microinjector technology. During these years, the Debtor focused on building out its platform, securing intellectual property rights

---

[3] Further information regarding the Debtor's business, capital structure, and the circumstances leading to the commencement of the Chapter 11 Case is set forth in detail in the First Day Declaration, which is incorporated by reference herein.  Copies of the First Day Declaration and all other Filings in the Chapter 11 Case can be obtained (and viewed) free of charge at the following web address: https://dm.epiq11.com/ClearsideBiomedical.

through exclusive licenses, and developing a pipeline of drug candidates that utilized its novel method of ocular drug delivery.

In June 2016, the Debtor completed its initial public offering ("IPO"), raising approximately $51 million of net proceeds to support its pipeline and ongoing development programs. Since the IPO, the Debtor has continued to focus on advancing its clinical programs and preclinical small molecule candidates, while pursuing strategic partnerships to commercialize targeted treatments for severe eye diseases.

2.    Key Contractual Relationships

a.    *HealthCare Royalty Management, LLC*

In August 2022, the Debtor entered into a royalty sale transaction with entities managed by HCR pursuant to, among other agreements, (i) a Contribution and Servicing Agreement (the "Contribution Agreement") between the Debtor and Clearside Royalty, (ii) a Purchase and Sale Agreement ("PSA") between Clearside Royalty and entities managed by HCR, and (iii) a Pledge and Security Agreement (the "Security Agreement") between the Debtor and HCR, pursuant to which the Debtor pledged 100% of its equity interest in Clearside Royalty as security for Clearside Royalty's obligations under the PSA.

Pursuant to the Contribution Agreement, the Debtor sold, contributed and assigned (the "Contribution") to Clearside Royalty, for the consideration specified therein, certain royalty-bearing license agreements and intellectual property, including the Debtor's out-license agreements with Arctic Vision, Bausch + Lomb, Aura Biosciences, and REGENXBIO, as well as its in-license agreement with Emory University and Georgia Tech Research Corporation. These agreements relate to XIPERE and the SCS Microinjector technology, along with any out-license agreements concerning the same technology entered into after the closing date (the "Contributed Assets"). The transfer is subject to an exclusive license back to the Debtor to develop and commercialize products other than those covered by the assigned out-license agreements included in the Contributed Assets. The Contribution expressly excluded any in-licensed or internally developed therapies licensed or developed after the closing date. The Contribution Agreement also provided for the Debtor's ongoing service obligations with respect to the Contributed Assets.

Pursuant to the PSA, Clearside Royalty sold to HCR certain rights to receive royalty and milestone payments under the Contributed Assets (the "Purchased Royalties") in exchange for up to $65 million from HCR, including an initial payment of $32.5 million (the "Investment Amount"). The rights to the Purchased Royalties will automatically expire once HCR has received royalty payments equal to the sum of the Investment Amount multiplied by 3.4 (i.e., $110 million) (the "Cap"). The right to royalty and milestone payments under the Contributed Assets in excess of the Cap have been retained by, or otherwise assigned back to, the Debtor. In the event of a change in control of the Debtor, the PSA further provides that the acquiring party may elect to either (i) satisfy Clearside Royalty's remaining obligations under the PSA by making a one-time payment equal to the Cap less royalties already paid, or (ii) make a change of control payment equal to $30 million, with the right to receive royalties continuing until the Cap is reached. Upon expiration of the PSA, all rights to receive future royalties revert to Clearside Royalty.

16

On September 4, 2025, the Debtor, Clearside Royalty, and HCR entered into an amendment agreement (the "Omnibus Amendment Agreement") in connection with the PSA, the Contribution Agreement, and the Security Agreement.  Pursuant to the Omnibus Amendment Agreement and the PSA as amended thereby (the "Amended PSA"), as additional consideration for the Purchased Royalties, HCR made an additional payment to Clearside Royalty in the amount of $3 million (the "Additional Consideration").

Pursuant to the Omnibus Amendment Agreement and the Contribution Agreement as amended thereby, Clearside Royalty used the Additional Consideration to acquire from the Debtor certain additional assets related to the SCS Microinjector technology (the "Additional Transferred Assets"), including intellectual property, manufacturing documentation, regulatory filings, and contractual rights necessary for the continued use of the SCS Microinjector technology, subject to one or more agreements providing for an appropriate grant back license, consent to use, and/or right of reference thereto as may be necessary or desirable in connection with the Debtor's business.

The Omnibus Amendment Agreement restated the Cap as the sum of (i) 3.0 multiplied by (ii) the sum of the Investment Amount and the Additional Consideration (i.e., $106.5 million), and revised the change of control provisions to exclude certain qualifying transactions occurring on or before May 31, 2026 from triggering the change of control payment, subject to the conditions set forth in the Amended PSA.

The Omnibus Amendment Agreement additionally amended the Security Agreement to include an agreement by HCR to not seek relief from the automatic stay in the event of a bankruptcy filing by the Debtor for a specified period ending on the earliest of: (i) May 31, 2026, (ii) conversion of the Chapter 11 Case to chapter 7, (iii) dismissal of the Chapter 11 Case, or (iv) the Bankruptcy Court's decision to abstain from hearing the Chapter 11 Case.  Pursuant to the Omnibus Amendment Agreement, HCR also agreed to consider in good faith the submission of a stalking horse bid for some or all of the Debtor's assets in the event the Debtor filed a petition for relief under Chapter 11 of the Bankruptcy Code, as well as a commitment by HCR to work in good faith with the Debtor to prepare and submit a commercially reasonable bid if HCR did elect to submit a stalking horse proposal.

b.    *Emory University and Georgia Tech Research Corporation*

The Debtor entered into an exclusive worldwide license agreement with Emory University and Georgia Tech Research Corporation (the "Emory and GT License Agreement") in July 2012, covering foundational intellectual property related to microneedle-based drug delivery to the suprachoroidal space.  The Emory and GT License Agreement, which underpins both the Debtor's internal pipeline and external collaborations, was sold and assigned to Clearside Royalty pursuant to the Contribution Agreement.  In January 2024, the Emory and GT License Agreement was amended to revise the sublicense revenue sharing and increased annual maintenance fees through 2028.

17

      c.     *Gerresheimer Regensburg GmbH*

The Debtor relies on third-party manufacturers for the production of its product candidates and the SCS Microinjector.  In May 2018, the Debtor entered into a key supply agreement with Gerresheimer for the manufacture of the SCS Microinjector (the "<u>Gerresheimer Supply Agreement</u>").  The Gerresheimer Supply Agreement automatically renews in three-year increments unless terminated by either party with one year's notice, and is currently renewed through 2029.

      Pursuant to the Omnibus Amendment Agreement, the Debtor reaffirmed its key supply relationship with Gerresheimer, and as part of the Additional Transferred Assets, the Debtor transferred all rights, title, and interest in and to the Gerresheimer Supply Agreement, along with the associated documentation, to Clearside Royalty.  These materials are essential to the continued manufacture and regulatory compliance of the SCS Microinjector and were included to ensure Clearside Royalty's ability to fulfill its obligations under the PSA and Contribution Agreement.

      d.     *Other Strategic Licensing and Collaboration Agreements*

The Debtor has cultivated a network of strategic partnerships to advance the commercialization and global reach of its SCS Microinjector platform.  In the United States and Canada, Bausch + Lomb holds exclusive rights to market XIPERE, the Debtor's first FDA-approved product. Across China, South Korea, India, ASEAN countries, Australia, and New Zealand, Arctic Vision holds the commercialization rights under a license agreement.

The Debtor has also partnered with Aura Biosciences, REGENXBIO, and BioCryst Pharmaceuticals, each leveraging the SCS Microinjector for development-stage programs in gene therapy, ocular oncology, and diabetic macular edema, respectively.  In July 2019, the Debtor licensed the SCS Microinjector to Aura Biosciences for use in treating choroidal melanoma.  In August 2019, the Debtor granted REGENXBIO an exclusive license to incorporate the technology into its gene therapy programs.  In November 2023, the Debtor entered into a global licensing agreement with BioCryst Pharmaceuticals, further extending the reach and impact of the SCS Microinjector.  Each of these license agreements were sold and assigned to Clearside Royalty pursuant to the Contribution Agreement, and Clearside Royalty's rights to receive milestone and royalty payments under each of these license agreements were sold to HCR pursuant to the PSA.

    3.    <u>Organizational Structure</u>

The Debtor was founded in 2011 and is incorporated under the laws of the State of Delaware.  The Debtor's principal executive offices are located in Alpharetta, Georgia. The Debtor has one wholly owned subsidiary, Clearside Royalty, a Delaware limited liability company.  Clearside Royalty is not a debtor in a chapter 11 proceeding.

    4.    <u>Prepetition Capital Structure</u>

As of the Petition Date, the Debtor had no funded debt obligations, including secured debt. As such, its Cash on hand is unencumbered and may be used to fund the administration of the Chapter 11 Case and the Debtor's ongoing operations without the need for secured creditor consent or third-party financing.  The Debtor has no outstanding trade debt.

5.      Real Estate

As of the Petition Date, the Debtor has maintained its corporate headquarters and sole operational facility in Alpharetta, Georgia.  This location serves as the company's principal office for corporate, administrative, and research and development activities.  The facility includes office space and laboratory infrastructure supporting the Debtor's internal pipeline development and its proprietary SCS Microinjector platform.  The Debtor leases this facility under a commercial lease agreement.

6.      Employees

As of July 17, 2025, the Debtor employed a total of 31 full-time employees, all of whom were located in the United States.  In connection with the company's strategic alternatives process and efforts to conserve Cash, the Debtor implemented a company-wide workforce reduction plan, pursuant to which all employees transitioned from employment to hourly consulting roles effective July 18, 2025.  The Debtor's consultants provide critical support to the Debtor across a range of operational areas, including licensing and partner support, training, regulatory compliance, safety database management, supply chain and manufacturing, quality assurance, engineering, accounting, SEC reporting, and other essential transition-related services.

As part of this transition, the Debtor's executive officers, including the Chief Executive Officer, Chief Financial Officer, and Chief Medical Officer, also moved into consulting roles. Each executive entered into a separation and consulting agreement with the Debtor, which provide for, among other things, hourly consulting compensation, continued vesting of outstanding equity awards, and eligibility for certain continued employee benefits.

7.      The Debtor's Equity Holders

The Debtor is a publicly held Delaware corporation.  On November 24, 2025, the Debtor received a notice from the staff of The Nasdaq Stock Market LLC ("Nasdaq") indicating that Nasdaq has determined to delist the Debtor's common stock from Nasdaq.  Trading in the common stock on Nasdaq was suspended effective December 1, 2025.  The common stock began trading on the OTC Pink Limited Market on December 1, 2025, under the symbol "CLSDQ."

**B.      Circumstances Giving Rise to the Chapter 11 Case**

1.      The Debtor's Declining Liquidity

Since its inception, the Debtor has incurred losses and cash outflows from its operations. The Debtor has therefore been dependent on its ability to raise additional capital to develop its technology, achieve its business objectives, and maintain operations and liquidity.  The Debtor has historically financed its operations primarily through public and private equity offerings, royalty monetization transactions, and strategic licensing agreements.  The Debtor, however, was not able to generate meaningful product revenue and has continued to incur substantial operating losses.

2.      The Debtor's Prepetition Restructuring Initiatives

In response to its financial and liquidity constraints, the Debtor undertook a comprehensive review of its strategic options with the objective of preserving and maximizing value for all stakeholders.  The Debtor's Board began discussions regarding strategic alternatives in December 2024, and the Strategic Committee, acting within the scope of its authority granted by the Board at the time of its original formation in May 2022, began meeting in January 2025 to oversee the Debtor's strategic review.[4]

In the spring of 2025, the Debtor retained BRG as its financial advisor and engaged Piper as its investment banker to assist in assessing and pursuing a broad range of potential transactions, including asset sales, licensing arrangements, mergers, and other restructuring alternatives to maximize value and preserve liquidity.

In parallel with this strategic review, and as discussed above, the Debtor implemented a company-wide workforce reduction designed to materially reduce operating expenses.  All employees were transitioned to consulting roles, and internal research and development activities were paused to preserve Cash while the Debtor explored out-of-court solutions that could deliver the highest possible recoveries.

3.      The Debtor's Prepetition Marketing Efforts

With its advisory team in place, the Debtor commenced a comprehensive marketing process to gauge interest for either a merger, sale, or other strategic transaction.  Given that its business operates in a specialized segment of the pharmaceutical and life sciences sector, the number of potential buyers was relatively confined and largely known to the Debtor and its advisors.  As a result, Piper and the Debtor's management focused on identifying potential buyers that represented the most likely strategic fit, including existing licensing partners and other pharmaceutical, biotechnology, and life sciences companies with complementary platforms or therapeutic pipelines.

In addition to this sale process and recognizing that its status as a publicly listed company could be of significant value to certain counterparties seeking an expedited path to public markets, the Debtor and its advisors also explored merger opportunities with companies in similar sectors whose business focus and growth stage would make them interested in potentially leveraging the Debtor's platform and public company status.

Piper contacted 41 prospective buyers, each of whom received an initial summary of the opportunity.  Piper and the Debtor's management team held preliminary discussions with nine parties to provide additional details, address questions, and assess potential strategic alignment on a potential transaction.  Eleven of the 41 parties also executed nondisclosure agreements, gaining access to a virtual data room containing confidential information about the Debtor's business, Assets, and operations.  In addition, after the Debtor announced its reduction in force and that it

---

[4] The Board established the Strategic Committee in May 2022 to evaluate a change of control transaction that ultimately did not come to fruition.  The Strategic Committee is currently comprised of George Lasezkay, Jeffrey L. Edwards, Richard Croarkin, and Clay B. Thorp.

was undergoing a strategic review process, four parties were provided with a formal process letter that outlined key transaction parameters and anticipated timelines. Ultimately, however, no party submitted an actionable proposal, and the Debtor was unable to consummate a value-maximizing out-of-court transaction.

Simultaneously with its prepetition marketing efforts, and in response to its deteriorating liquidity position, the Debtor explored additional pathways for potential financing sources, including efforts to raise funding through existing and prospective investors, as well as strategic partners, in a private offering of its securities. As part of its efforts to raise funding through a private offering, the Debtor engaged Citizens Bank N.A. and held meetings with 71 potential investors. Despite these efforts, the Debtor was unable to secure sufficient investor commitments.

With substantially all royalty-generating assets previously assigned to its subsidiary, Clearside Royalty, and its remaining assets not generating any revenue, the Debtor lacked the ability to generate meaningful cash flow. Additionally, the marketing process confirmed that no actionable value-maximizing sale transaction was available in the near term, and financing was unlikely. As a result, the Debtor faced a rapidly depleting cash position and no realistic source of new capital to extend its operational runway.

Accordingly, the Board, with input and guidance from the Strategic Committee, determined that commencing a prompt and efficient chapter 11 case was the only viable path forward to preserve and maximize value for all stakeholders.

## C.    The Chapter 11 Case

The following is a brief description of certain material events that have occurred during the Chapter 11 Case.

### 1.    First Day Motions and Orders

On the Petition Date, in addition to the voluntary petition for relief Filed by the Debtor under chapter 11 of the Bankruptcy Code, the Debtor also Filed a number of motions and applications seeking certain "first day" relief, including the following:

- *Debtor's Application for Entry of an Order (I) Authorizing and Approving the Appointment of Epiq Corporate Restructuring, LLC as Claims and Noticing Agent in the Chapter 11 Case; and (II) Granting Related Relief* [Docket No. 9]. The Debtor sought authorization to retain and employ Epiq Corporate Restructuring LLC as its Claims and Noticing Agent for the Chapter 11 Case. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the application [Docket No. 28].

- *Debtor's Motion for Entry of Order (I) Authorizing the Debtor to Redact Certain Personal Identification Information for Individual; (II) Waiving the Requirement to File a List of All Equity Holders of the Debtor and Modifying Notice Thereto; and (III) Granting Related Relief* [Docket No. 7]. The Debtor sought entry of an Order (a) authorizing the Debtor to redact

21

certain personally identifiable information of individual stakeholders, including but not limited to former employees and individual equity holders, (b) waiving the Debtor's requirement to File a list of equity holders and modifying notice thereto, and (c) granting related relief. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the motion [Docket No. 27].

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Using the Cash Management System, (B) Maintain Prepetition Bank Accounts, Credit Card, and Payment Methods, and (C) Continue to Perform Transactions on Behalf of Non-Debtor Subsidiary in the Ordinary Course of Business; (II) Extending Time to Comply with Section 345(b) of the Bankruptcy Code; (III) Waiving Compliance with Certain of the U.S. Trustee Guidelines; and (IV) Granting Related Relief* [Docket No. 4]. The Debtor sought entry of interim and final orders authorizing, but not directing, the continued use of its centralized cash management system, bank accounts, credit card, and payment methods, and to perform transactions with its non-debtor subsidiary in the ordinary course of business, while waiving or modifying certain deposit requirements under section 345(b) of the Bankruptcy Code. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 32]. On December 31, 2025, the Bankruptcy Court entered a second interim Order [Docket No. 146].

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing, but not Directing, the Debtor to (A) Pay or Otherwise Honor the Workforce Obligations in the Ordinary Course of Business and (B) Pay Prepetition Independent Contractor Obligations; (II) Authorizing the Debtor's Banks to Honor and Process Related Checks and Transfers; and (III) Granting Related Relief* ("Workforce Obligations Motion") [Docket No. 3]. The Debtor sought entry of interim and final Orders (a) authorizing, but not directing, the Debtor to pay or otherwise honor certain workforce obligations in the ordinary course of business, including prepetition amounts owed for services provided by its independent contractors and their ongoing hourly consulting payments, continued health insurance coverage, and one-time completion bonuses for certain independent contractors; (b) authorizing the Debtor's banks to honor and process related checks and electronic fund transfers; and (c) granting related relief. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the Workforce Obligations Motion on an interim basis [Docket No. 33] and thereafter entered an Order granting the relief requested in the motion on a final basis on December 22, 2025 [Docket No. 100].

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor to Pay Certain Prepetition Taxes and Fees and Related Obligations and (II) Granting Related Relief* [Docket No. 6]. The Debtor sought entry of interim and final orders authorizing, but not directing, the Debtor, in its

discretion and business judgment, to pay prepetition taxes and fees related thereto as they come due in the ordinary course of business. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 30] and thereafter entered an Order granting the relief requested in the motion on a final basis on December 22, 2025 [Docket No. 102].

- *Debtor's Motion for Entry of Interim and Final Orders (I) Authorizing the Debtor (A) to Maintain Existing Insurance Policies and Programs and Pay All Obligations Arising Thereunder and (B) to Renew, Revise, Extend, Supplement, Change, or Obtain New Insurance Policies and Programs; and (II) Granting Related Relief* [Docket No. 8]. The Debtor sought entry of interim and final Orders authorizing, but not directing, the Debtor, to (a) continue to maintain and administer its prepetition insurance policies and revise, extend, renew, supplement, or change such policies, as needed, (b) continue its insurance premium financing program and renew or enter into new premium financing programs as necessary under substantially similar terms, and (c) pay or honor obligations arising under or in connection with its insurance policies, including prepetition amounts related thereto. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 31] and thereafter entered an Order granting the relief requested in the motion on a final basis on December 22, 2025 [Docket No. 103].

- *Debtor's Motion for Interim and Final Orders (I) Approving the Debtor's Proposed Form of Adequate Assurance Payment; (II) Establishing Procedures for Resolving Objections by the Utility Companies; (III) Prohibiting the Utility Companies from Altering, Refusing, or Discontinuing Service; and (IV) Granting Related Relief* [Docket No. 5]. The Debtor sought entry of interim and final Orders (a) prohibiting utility companies from discontinuing, altering or refusing service to the Debtor on account of non-payment for any prepetition services, (b) deeming the utility companies to have received adequate assurance of future payment, (c) establishing procedures for resolving requests for additional assurance of payment, and (d) granting related relief. On November 25, 2025, the Bankruptcy Court entered an Order granting the relief requested in the motion on an interim basis [Docket No. 29] and thereafter entered an Order granting the relief requested in the motion on a final basis on December 22, 2025 [Docket No. 101].

2.    <u>Employment of the Debtor's Professionals and Advisors</u>

On December 31, 2025, the Bankruptcy Court entered Orders authorizing the employment of the following professionals and advisors to the Debtor: (i) Cooley LLP as lead counsel to the Debtor [Docket No. 139]; (ii) Richards, Layton & Finger, P.A. as bankruptcy co-counsel to the Debtor [Docket No. 138]; (iii) Epiq Corporate Restructuring, LLC as administrative advisor to the Debtor [Docket No. 143]; and (iv) BRG as financial advisor to the Debtor [Docket No. 140].

3.      The Ad Hoc Group

On December 16, 2025, a group of certain of the Debtor's equity holders Filed with the Bankruptcy Court a notice of appearance [Docket No. 61] and a verified statement pursuant to Bankruptcy Rule 2019 [Docket No. 62, amended at Docket No. 66]. In parallel, the Ad Hoc Group requested that the United States Trustee appoint an official committee of equity security holders. After due deliberation and consideration, on December 23, 2025, the United States Trustee decided to not appoint an official committee of equity security holders.

On December 24, 2025, the Ad Hoc Group Filed the Appointment Motion, seeking an Order directing the United States Trustee to appoint an official committee of equity security holders. The Bankruptcy Court set January 16, 2026, at 11:00 a.m., prevailing Eastern Time, for the hearing on the Appointment Motion.

4.      Bidding Procedures & Designation of the Stalking Horse for the Debtor's Assets

Following the commencement of this Chapter 11 Case, the Debtor continued to pursue a robust marketing process and engaged in extensive, arm's-length negotiations with multiple parties to identify a potential stalking horse bidder for substantially all of its Assets. To maximize value for the Estate and ensure a transparent and competitive sale process, on December 10, 2025, the Debtor Filed the Bidding Procedures Motion. The Bidding Procedures Motion sought, among other things, approval of the bidding procedures ("Bidding Procedures") for the Sale Transaction under section 363 of the Bankruptcy Code, authority to designate a stalking horse bidder and provide bid protections, schedule an auction and a sale hearing, and approve assumption and assignment procedures for Executory Contracts and Unexpired Leases.

On December 17, 2025, the Debtor filed a notice designating Health Ocean Pharma (Eye) Limited as the Stalking Horse Bidder [Docket No. 70]. Health Ocean Pharma (Eye) Limited's stalking horse bid (the "Stalking Horse Bid") contemplates the purchase of substantially all of the Debtor's Assets for $2.7 million in cash, subject to higher or otherwise better offers received by the Debtor pursuant to the Bidding Procedures. If no higher or better qualified bids are received by the Bid Deadline (as defined in the Bidding Procedures), the Stalking Horse Bidder will be deemed the Successful Bidder.

On December 19, 2025, the Bankruptcy Court entered the Bidding Procedures Order.

5.      Claims Process & Bar Dates

a.      *Section 341(a) Meeting of Creditors*

On December 23, 2025, the United States Trustee held and concluded the section 341(a) meeting of creditors in this Chapter 11 Case.

b.      *Schedules and Statements*

On December 9, 2025, the Debtor Filed with the Bankruptcy Court sealed and redacted

versions of its Schedules.

        c.    *Bar Dates*

Pursuant to the Bar Date Order, the Bankruptcy Court established (i) January 26, 2026, at 11:59 p.m., prevailing Eastern Time, as the General Bar Date; (ii) May 22, 2026 at 11:59 p.m., Eastern Time, as the Governmental Bar Date; (iii) the Amended Schedules Bar Date as the later of (a) the General Bar Date or the Governmental Bar Date, as applicable to the Claim, and (b) 11:59 p.m., prevailing Eastern Time, on the date that is twenty-one (21) days from the date on which the Debtor provides notice of the amendment to the Schedules; and (iv) the Rejection Damages Bar Date as the later of (a) the General Bar Date, or (b) 11:59 p.m., prevailing Eastern Time, on the date that is thirty (30) days after the later of (x) entry of an Order approving the rejection of an Executory Contract or Unexpired Lease of the Debtor, or (y) the effective date of a rejection of an Executory Contract or Unexpired Lease of the Debtor.

      6.    <u>NOL Motion</u>

On December 17, 2025, the Debtor Filed the NOL Motion, seeking interim and final orders to establish procedures designated to preserve its estimated $502 million in net operating losses ("<u>NOLs</u>") and preserve the Debtor's ability to use certain of the accrued NOLs to reduce the Debtor's tax liabilities.

On December 19, 2025, the Bankruptcy Court held a hearing to consider the relief requested in the NOL Motion and thereafter entered an Order granting the relief requested on an interim basis with modifications to certain notice timeframe requirements [Docket No. 91]. On December 31, 2025, the Bankruptcy Court entered an Order granting the NOL Motion on a final basis [Docket No. 144].

## IV.    <u>SUMMARY OF TREATMENT OF CLAIMS AND EXISTING EQUITY INTERESTS AND ESTIMATED RECOVERIES</u>

### A.    <u>Summary of Treatment of Claims and Existing Equity Interests and Estimated Recoveries</u>

The following chart provides a summary of treatment of each Class of Claims and Existing Equity Interests (other than Administrative Expense Claims and Priority Tax Claims) and an estimate of the recoveries of each Class.[5] The treatment provided in this chart is for informational purposes only and is qualified in its entirety by <u>Article VII</u> of this Combined Disclosure Statement and Plan.

---

[5] These amounts represent estimated Allowed Claims and Existing Equity Interests, and do not represent amounts actually asserted by Creditors in proofs of claim or otherwise. The Debtor has not completed its analysis of Claims in the Chapter 11 Case and objections to such Claims have not been fully litigated. Therefore, there can be no assurances of the exact amount of the Allowed Claims or Existing Equity Interests at this time. Rather, the actual amount of the Allowed Claims or Existing Equity Interests may be greater or lower than estimated.

| Class | Treatment / Voting Status | Estimated Claims / Projected Recovery |
|---|---|---|
| Class 1 – Secured Claims | Unimpaired / Deemed to Accept | Approx. $0 <br><br> Recovery: N/A |
| Class 2 – Priority Non-Tax Claims | Unimpaired / Deemed to Accept | Approx. $0 <br><br> Recovery: 100% |
| Class 3 – General Unsecured Claims | Unimpaired / Deemed to Accept | Approx. TBD <br><br> Recovery: 100% |
| Class 4 – Existing Equity Interests | Impaired / Deemed to Reject | Approx. $[●] <br><br> Recovery: TBD |

## V.   TREATMENT OF UNCLASSIFIED CLAIMS

### A.   Administrative Expense Bar Date

Requests for payment of Administrative Expense Claims (other than 503(b)(9) Claims, which are subject to the General Bar Date, Professional Fee Claims, and the Claims of Governmental Units arising under section 503(b)(1)(B), (C), or (D) of the Bankruptcy Code) must be Filed no later than the Administrative Expense Bar Date.  Unless otherwise ordered by the Bankruptcy Court, Holders of Administrative Expense Claims (other than the Holders of 503(b)(9) Claims, Professional Fee Claims and the Claims of Governmental Units arising under section 503(b)(1)(B), (C), or (D) of the Bankruptcy Code) that do not File requests for the allowance and payment thereof on or before the Administrative Expense Bar Date shall forever be barred from asserting such Administrative Expense Claims against the Debtor or their Estate.

### B.   Administrative Expense Claims

Except to the extent that any Entity entitled to payment of an Allowed Administrative Expense Claim agrees to a different treatment, each Holder of an Allowed Administrative Expense Claim shall receive Cash in an amount equal to such Allowed Administrative Expense Claim on the later of (i) the Effective Date or (ii) seven (7) Business Days after the entry of a Final Order Allowing such Administrative Expense Claim, or as soon thereafter as is practicable.  Such payments to Holders of Allowed Administrative Expense Claims shall be paid by the Plan Administrator.  Objections to Administrative Expense Claims must be Filed and served on the Plan Administrator and the requesting party by the Administrative Expense Claim Objection Deadline.

## C.    Priority Tax Claims

### 1.    Priority Tax Claims

Pursuant to section 1129(a)(9)(C) of the Bankruptcy Code, unless otherwise agreed by the Holder of a Priority Tax Claim and the Debtor or the Plan Administrator, as applicable, each Holder of an Allowed Priority Tax Claim will receive, at the sole option of the Debtor or the Plan Administrator, as applicable, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, its Allowed Priority Tax Claim that is due and payable on or before the Effective Date, (i) Cash in an amount equal to the amount of such Allowed Priority Tax Claim, or such other amount agreed to by the Plan Administrator and such Holder, on the Effective Date or within seven (7) Business Days after such Allowed Priority Tax Claim becomes an Allowed Claim, whichever is later, or as soon thereafter as is practicable, or (ii) Cash in an aggregate amount of such Allowed Priority Tax Claim payable in installment payments over a period of time not to exceed five years after the Petition Date, pursuant to section 1129(a)(9)(C) of the Bankruptcy Code; *provided*, *however*, that all Allowed Priority Tax Claims that are not due and payable on or before the Effective Date shall be paid in the ordinary course of business by the Plan Administrator as they become due.

### 2.    Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding anything to the contrary stated in this Combined Disclosure Statement and Plan, any Claim on account of any penalty arising with respect to or in connection with an Allowed Priority Tax Claim that does not compensate the Holder for actual pecuniary loss shall be treated as a General Unsecured Claim, and the Holder (other than as the Holder of a General Unsecured Claim) may not assess or attempt to collect such penalty from the Debtor or their respective property.

## D.    Professional Fee Claims

### 1.    Final Fee Applications and Payment of Professional Fee Claims

All final requests for payment of Professional Fee Claims may be made any time after confirmation but shall be Filed no later than forty-five (45) days after the Effective Date. All such final requests will be subject to approval by the Bankruptcy Court in accordance with the procedures established by the Bankruptcy Code, the Bankruptcy Rules and prior Orders of the Bankruptcy Court, including the Interim Compensation Order, and once approved by the Bankruptcy Court, shall be promptly paid from the Professional Fee Reserve up to the full Allowed amount.

### 2.    Professional Fee Reserve

As soon as practicable after confirmation and not later than the Effective Date, the Debtor shall establish and fund the Professional Fee Reserve with Cash from the Debtor's Assets in an amount equal to the Professional Fee Escrow Amount. The Professional Fee Reserve shall be maintained in trust for the Professionals. Such funds shall not be considered property of the Debtor's Estate, provided that the Debtor's Estate shall have a residual interest in any excess Cash in the Professional Fee Reserve after payment of Allowed Professional Fee Claims. The amount

27

of Allowed Professional Fee Claims owing to the Professionals shall be paid in Cash to such Professionals from funds held in the Professional Fee Reserve as set forth herein.  Once payments on account of such Allowed Professional Fee Claims have been made in full, any such excess Cash remaining in the Professional Fee Reserve shall be considered Assets of the Post-Effective Date Debtor's Estate for Distribution by the Plan Administrator in accordance with the terms of this Combined Disclosure Statement and Plan.  For the avoidance of doubt, (i) to the extent that the Professional Fee Reserve is not sufficient to satisfy in full all Allowed Professional Fee Claims, such Allowed Claims shall nevertheless be paid in full from available Cash by the Plan Administrator, and (ii) any reasonable fees and expenses incurred by Professionals in connection with preparing fee applications shall be paid from the Professional Fee Reserve.

3.    Allocation and Estimation of Professional Fee Claims

Professionals providing services to the Debtor shall reasonably estimate their unpaid Professional Fee Claims against the Debtor relating to the period prior to and through the Effective Date and shall deliver such estimate to the Debtor by two (2) Business Days prior to the Effective Date; *provided*, *however*, that such estimate shall not be considered an admission with respect to the fees and expenses of such Professional and such Professionals are not bound to any extent by the estimates.  If a Professional does not provide an estimate, the Debtor may estimate the unbilled fees and expenses of such Professional.

4.    Timing for Filing Professional Fee Claims

All requests for compensation or reimbursement of Professionals retained in the Chapter 11 Case for services performed and expenses incurred prior to the Effective Date shall be Filed and served on: (a) the Debtor's counsel, (i) Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, DE 19801 (Attn: Daniel J. DeFranceschi (defranceschi@rlf.com), Michael J. Merchant (merchant@rlf.com), and Alexander R. Steiger (steiger@rlf.com)) and  (ii) Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn:  Daniel Shamah (dshamah@cooley.com), Lauren A. Reichardt (lreichardt@cooley.com), Olya Antle (oantle@cooley.com), and Miriam Peguero Medrano  (mpegueromedrano@cooley.com)); (b) the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane M. Leamy (jane.m.leamy@usdoj.gov)) and (c) such other entities who are designated by the Bankruptcy Rules, the Confirmation Order, or other Order of the Bankruptcy Court, by no later than forty-five (45) days after the Effective Date, unless otherwise agreed by the Debtor or the Plan Administrator, as applicable.  Objections to any Professional's Claim must be Filed and served on the Plan Administrator and the requesting party no later than twenty-one (21) days after the Filing of a Professional Fee Claim (the "Professional Fee Claims Objection Deadline").

5.    Post-Effective Date Fees and Expenses

Upon the Effective Date, any requirement that Professionals comply with sections 327 through 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate, and, subject to the Plan Administrator Agreement, the Plan Administrator may employ and pay any Professional for services rendered or expenses incurred

28

after the Effective Date in the ordinary course of business without any further notice to, or action, Order, or approval of, the Bankruptcy Court.

### E.    Payment of Statutory Fees

All Statutory Fees that become due and payable prior to the Effective Date shall be paid by the Debtor on the Effective Date.  After the Effective Date, the Plan Administrator shall pay any and all such fees when due and payable, and shall File with the Bankruptcy Court quarterly reports in a form reasonably acceptable to the United States Trustee.  The Debtor shall remain obligated to pay quarterly fees to the United States Trustee until the earliest of the Debtor's case being closed, dismissed or converted to a case under chapter 7 of the Bankruptcy Code.

## VI.    CLASSIFICATION OF CLAIMS AND EXISTING EQUITY INTERESTS; ESTIMATED RECOVERIES

Pursuant to sections 1122 and 1123 of the Bankruptcy Code, Claims and Existing Equity Interests are classified for the purposes of voting and Distribution pursuant to this Combined Disclosure Statement and Plan, as set forth herein.  A Claim or Existing Equity Interest shall be deemed classified in a particular Class only to the extent that the Claim or Existing Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Existing Equity Interest qualifies within the description of such other Class.  Except as otherwise specifically provided for herein, the Confirmation Order or any other Order of the Bankruptcy Court, or required by applicable bankruptcy law, in no event shall the aggregate value of all property received or retained under this Combined Disclosure Statement and Plan on account of an Allowed Claim exceed 100% of the underlying Allowed Claim.

## VII.    TREATMENT OF CLAIMS AND EXISTING EQUITY INTERESTS

### A.    Treatment of Claims and Existing Equity Interests

1.    CLASS 1 –SECURED CLAIMS

a.    *Classification*

Class 1 consists of the Secured Claims.

b.    *Impairment and Voting*

Class 1 is unimpaired by this Combined Disclosure Statement and Plan.  Holders of Class 1 Claims are conclusively presumed to have accepted this Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

c.    *Treatment*

Except to the extent that a Holder of an Allowed Secured Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the Effective Date or the date

such Claim becomes an Allowed Secured Claim, each Holder of such Allowed Secured Claim shall receive, at the option of the Post-Effective Date Debtor, payment in full in Cash or such other treatment rendering such Allowed Secured Claim unimpaired.

2.      CLASS 2 – PRIORITY NON-TAX CLAIMS

a.      *Classification*

Class 2 consists of Priority Non-Tax Claims.

b.      *Impairment and Voting*

Class 2 is unimpaired by this Combined Disclosure Statement and Plan.  Holders of Allowed Priority Non-Tax Claims are conclusively presumed to have accepted this Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

c.      *Treatment*

Except to the extent that a Holder of a Priority Non-Tax Claim agrees to a less favorable or different treatment, on, or as soon as reasonably practicable after, the later of the Effective Date or the date such Priority Non-Tax Claim becomes an Allowed Priority Non-Tax Claim, each Holder of an Allowed Priority Non-Tax Claim shall receive Cash in an amount equal to such Allowed Priority Non-Tax Claim.

3.      CLASS 3 – GENERAL UNSECURED CLAIMS

a.      *Classification*

Class 3 consists of General Unsecured Claims.

b.      *Impairment and Voting*

Class 3 is unimpaired by this Combined Disclosure Statement and Plan.  Holders of General Unsecured Claims are conclusively presumed to have accepted this Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

c.      *Treatment*

On or about the Effective Date, each Holder of an Allowed General Unsecured Claim shall receive, on account of and in full and complete settlement, release and discharge of, and in exchange for its Allowed General Unsecured Claim, either (i) payment of its Allowed General Unsecured Claim in full in Cash, or (ii) such other treatment as to which the Post-Effective Date Debtor and the Holder of such Allowed General Unsecured Claim shall have agreed upon in writing.

4.      CLASS 4 – EXISTING EQUITY INTERESTS

    a.      *Classification*

Class 4 consists of the Existing Equity Interests.

    b.      *Impairment and Voting*

Class 4 is Impaired by this Combined Disclosure Statement and Plan.  Holders of Class 4 Existing Equity Interests are conclusively presumed to have rejected this Combined Disclosure Statement and Plan and, therefore, are not entitled to vote to accept or reject this Combined Disclosure Statement and Plan.

    c.      *Treatment*

On the Effective Date, all Existing Equity Interests shall be canceled, released, and extinguished in connection with the wind-down of the Debtor, and shall be of no further force or effect, whether surrendered for cancellation or otherwise.  Notwithstanding such cancellation, Holders of Allowed Existing Equity Interests shall be entitled to receive their Pro Rata share of the Distributions from the Net Distributable Assets, consistent with their respective interests in the Debtor as of the Petition Date in full and final satisfaction, settlement, release, and discharge of such Existing Equity Interests.

## B.      **Modification of Treatment of Claims and Existing Equity Interests**

The Debtor and the Plan Administrator, as applicable, reserve the right to modify the treatment of any Allowed Claim or Existing Equity Interest in any manner adverse only to the Holder of such Claim or Existing Equity Interest at any time after the Effective Date upon the consent of the Holder of the Claim or Existing Equity Interest whose Allowed Claim or Existing Equity Interest, as the case may be, is being adversely affected.

## C.      **Cramdown and No Unfair Discrimination**

Class 4, the Existing Equity Interests, is Impaired under this Combined Disclosure Statement and Plan and, pursuant to the Bankruptcy Code, is deemed to vote to reject this Combined Disclosure Statement and Plan.  With respect to Class 4, the Debtor respectfully requests that the Bankruptcy Court confirm this Combined Disclosure Statement and Plan under section 1129(b) of the Bankruptcy Code, and that this Combined Disclosure Statement and Plan is deemed a motion for such relief.

Section 1129(b) of the Bankruptcy Code permits confirmation of a plan over the deemed rejection of an Impaired Class of Equity Interests, provided certain requirements are satisfied. Here, because no Class of Equity Interests junior to Class 4 will receive or retain any property under this Combined Disclosure Statement and Plan, the "fair and equitable" requirement of section 1129(b)(2)(C)(ii) of the Bankruptcy Code is satisfied.  Moreover, section 1129(a)(10) of the Bankruptcy Code, which requires acceptance by at least one Impaired Class of Claims, is inapplicable to Impaired Classes of Equity Interests, and none of the Classes of Claims are Impaired under this Combined Disclosure Statement and Plan.

31

Accordingly, the Debtor submits that this Combined Disclosure Statement and Plan may be confirmed under section 1129(b) of the Bankruptcy Code by cramming down the Holders of the Existing Equity Interests in Class 4, who will nonetheless be entitled to receive their Pro Rata share of the Net Distributable Assets in accordance with their respective ownership interests as of the Petition Date. All other Classes of Claims are unimpaired and therefore deemed to accept this Combined Disclosure Statement and Plan under section 1129(a)(9) of the Bankruptcy Code.

**D.    Reservation of Rights Regarding Claims**

Except as otherwise provided in this Combined Disclosure Statement and Plan or in other Orders of the Bankruptcy Court, nothing shall affect the rights or defenses of the Debtor or the Plan Administrator, as applicable, whether legal or equitable, with respect to any Claim, including all rights with respect to legal and equitable defenses to alleged rights of setoff or recoupment.

## VIII.    EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.    Rejection of Executory Contracts and Unexpired Leases**

On the Effective Date, except with respect to the Insurance Policies, including the D&O Insurance Policies, all Executory Contracts (including any Unexpired Leases) that are not (i) assumed, assumed and assigned, or rejected before the Effective Date, (ii) subject to a pending motion to assume, assume and assign, or reject as of the Effective Date, or (iii) set forth on any assumption schedule for assumption and assignment to the Plan Administrator on the Effective Date, will be deemed rejected. The Confirmation Order shall constitute an Order approving such rejection as of the Effective Date.

**B.    Deadline for Filing Proofs of Claim Relating to Executory Contracts and Unexpired Leases Rejected Pursuant to this Combined Disclosure Statement and Plan**

If the rejection by the Debtor of an Executory Contract (including any Unexpired Lease) pursuant to this Combined Disclosure Statement and Plan gives rise to a Claim, a proof of Claim must be Filed with the Claims and Noticing Agent (i) via the electronic filing interface available at https://dm.epiq11.com/ClearsideBiomedical; or (ii) by U.S. mail, overnight U.S. mail, or other hand delivery system, so as to be actually received by the Claims and Noticing Agent at the following address:

If by First-Class Mail:
Clearside Biomedical, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC
P.O. Box 4421
Beaverton, OR 97076-4421

If by Hand Delivery or Overnight Mail:
Clearside Biomedical, Inc.
Claims Processing Center
c/o Epiq Corporate Restructuring, LLC

10300 SW Allen Blvd.
Beaverton, OR 97005

Proofs of Claim submitted by facsimile or electronic mail will not be accepted. Proofs of Claim will be accepted by no later than thirty (30) days after service of the notice of the Effective Date. Any proofs of Claim not Filed and served within such time period will be forever barred from assertion against the Debtor, its Estate, the Plan Administrator and the Post-Effective Date Debtor. Unless otherwise ordered by the Bankruptcy Court, all Claims arising from the rejection of Executory Contracts and Unexpired Leases shall be treated as Class 3 (General Unsecured Claims) under this Combined Disclosure Statement and Plan. For the avoidance of doubt, any Claims arising from the rejection of an Executory Contract or Unexpired Lease pursuant to a separate motion are subject to the relevant Rejection Damages Bar Date, as applicable.

### C. <u>Insurance Policies</u>

Nothing in this Combined Disclosure Statement and Plan and/or the Confirmation Order alters the rights and obligations of the Debtor (and its Estate) and the Debtor's Insurers (and third-party claims administrators) under the Insurance Policies or modifies the coverage or benefits provided thereunder or the terms or conditions thereof or diminishes or impairs the enforceability of the Insurance Policies.

Each Insurance Policy, including the D&O Insurance Policies, to which the Debtor is a party as of the Effective Date, shall be deemed an Executory Contract and shall be assumed by the Plan Administrator on behalf of the Debtor effective as of the Effective Date pursuant to sections 365 and 1123 of the Bankruptcy Code and coverage for defense and indemnity under the D&O Insurance Policies shall remain available to all individuals within the definition of an "Insured," "Insured Persons," or an "Insured Entity" in the D&O Insurance Policies. In addition, after the Effective Date, all officers, directors, employees, or managers who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of the D&O Insurance Policies in effect or purchased as of the Petition Date for the full term of such policies regardless of whether such officers, directors, employees, and/or managers remain in such positions after the Effective Date, in each case, to the extent set forth in the D&O Insurance Policies.

### IX. <u>IMPLEMENTATION AND EFFECT OF CONFIRMATION OF COMBINED DISCLOSURE STATEMENT AND PLAN</u>

### A. <u>Means for Implementation of this Combined Disclosure Statement and Plan</u>

In addition to the provisions set forth elsewhere in this Combined Disclosure Statement and Plan, the following shall constitute the means for implementation of this Combined Disclosure Statement and Plan:

1. <u>Funding of Liabilities and Distributions</u>. Allowed Claims, Allowed Existing Equity Interests, and any amounts necessary to wind down the Debtor's Estate shall be paid from the Debtor's Assets, including proceeds from the Sale Transaction, subject to limitations and qualifications described herein.

2.      Revesting of Debtor's Assets.  Any Assets that are property of the Debtor's Estate on the Effective Date including, without limitation, any Causes of Action, shall revest in the Post-Effective Date Debtor on the Effective Date.  Thereafter, subject to the terms of this Combined Disclosure Statement and Plan, the Post-Effective Date Debtor (through the Plan Administrator) may operate pursuant to the terms of the Plan Administrator Agreement and may use, acquire, and dispose of such property free of any restrictions of the Bankruptcy Code, the Bankruptcy Rules, or Bankruptcy Court approval.  Except as specifically provided in this Combined Disclosure Statement and Plan or the Confirmation Order, as of the Effective Date, all Assets of the Debtor shall be free and clear of any Liens, Claims, encumbrances and interests of any kind.

3.      Cancellation of Existing Equity Interests.  On the Effective Date, all Existing Equity Interests shall be canceled, released, retired and extinguished in connection with the wind-down of the Debtor, shall no longer be outstanding and shall be of no further force or effect, whether surrendered for cancellation or otherwise.  On the Effective Date, any Holder of Existing Equity Interests shall no longer have any rights with respect to such Existing Equity Interests, except as otherwise provided in this Combined Disclosure Statement and Plan or Order of the Bankruptcy Court.  The Plan Administrator shall have all power necessary to effect any corporate action necessary to wind down Debtor's affairs, resolve Claims, implement this Combined Disclosure Statement and Plan, as more fully set forth in Article X below, and implement any Order of the Bankruptcy Court without further action of the Board or stockholders of Debtor and may sign any document, instrument or certificate (including, without limitation, a certificate of dissolution) and make any Filings on behalf of Debtor in connection with the foregoing.

4.      Comprehensive Settlement of Claims and Controversies.  Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, this Combined Disclosure Statement and Plan incorporates an integrated compromise and settlement designed to achieve a beneficial and efficient resolution of the Chapter 11 Case for all parties in interest.  Accordingly, in consideration of the Distributions, the treatment of certain Classes of Claims, and other benefits provided under this Combined Disclosure Statement and Plan, the provisions of this Combined Disclosure Statement and Plan, including the releases set forth in Article XIV hereof, shall constitute a good-faith compromise and settlement of all Claims, disputes and controversies relating to the rights that a Holder of a Claim may have against the Debtor, that the Debtor may have against a Person or Entity released under this Combined Disclosure Statement and Plan, or with respect to any Distribution to be made pursuant to this Combined Disclosure Statement and Plan on account of any such Claims.

The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such Claims, disputes, or controversies provided for herein, and the Bankruptcy Court's determination that such compromises and settlements are in the best interests of the Debtor, its Estate, Creditors and all other parties in interest, and are fair, equitable and within the range of reasonableness.  If the Effective Date does not occur, the settlements set forth herein shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

5.      Officer Settlement Agreement.  On the Effective Date, the Debtor shall pay (or cause to be paid) the Settlement Payments to the Officer Parties in full and final satisfaction,

settlement, release, and discharge of any and all Claims, causes of action, rights, or entitlements of the Officer Parties against the Debtor, including for the Completion Payments under their respective consulting agreements with the Debtor and any related Claims or causes of action under the Bankruptcy Code or applicable law.  Any proofs of Claim Filed by the Officer Parties are hereby deemed withdrawn, and each Officer Party covenants to not assert any Claims or causes of action against the Debtor or its Estate.

The Settlement Payments are acknowledged by the parties as reasonable in light of (i) the significant risk of costly litigation that may arise if the Officer Parties assert Claims or causes of action against the Debtor or its Estate; (ii) the magnitude of the Completion Payments, if asserted, and their dilutive effect on recoveries to the Debtor's Creditors and Holders of Existing Equity Interests; (iii) the Officer Parties' contributions during the Consulting Period, which exceeded the scope of their hourly compensation and reflected significant additional effort to support the Debtor's operations; and (iv) the Officer Parties' agreement to remain engaged beyond the originally contemplated term of the consulting agreements without any increase in their respective consulting rates in an effort to allow the Debtor to extend its liquidity runway and consummate a Sale Transaction.

This Combined Disclosure Statement and Plan constitutes the Officer Settlement Agreement, which shall be binding and enforceable without the need for any separate agreement. The Confirmation Order shall approve the Officer Settlement Agreement under Bankruptcy Rule 9019 and authorize the Settlement Payments on the Effective Date without the need for any further Order of the Bankruptcy Court.

6.      Preservation of Causes of Action.   Any and all Causes of Action that are not expressly released or waived under this Combined Disclosure Statement and Plan are reserved and preserved and vest in the Post-Effective Date Debtor on the Effective Date.  No Person may rely on the absence of a specific reference in this Combined Disclosure Statement and Plan or the Plan Supplement to any Cause of Action against it as any indication that the Post-Effective Date Debtor (through the Plan Administrator) will not pursue any and all available Causes of Action against such Person.  The Debtor and the Plan Administrator expressly reserve all Causes of Action, except for Causes of Action against any Person that are expressly released or waived or limited under this Combined Disclosure Statement and Plan and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action upon, after, or as a consequence of confirmation or consummation of this Combined Disclosure Statement and Plan.

7.      Corporate Action; Effectuating Documents; Further Transactions.  On the Effective Date, all matters and actions provided for under this Combined Disclosure Statement and Plan that would otherwise require approval of the directors and officers, or members or managers of the Debtor shall be deemed to have been authorized and effective in all respects as provided herein and shall be taken without any requirement for further action by the directors and officers, members and managers of the Debtor.  The Debtor or the Plan Administrator, as applicable, are authorized to execute, deliver, File or record such contracts, instruments, releases, and other agreements or documents and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Disclosure Statement and Plan.

8.    <u>Direction to Parties.</u>  From and after the Effective Date, the Plan Administrator may apply to the Bankruptcy Court for an Order directing any necessary party to execute, deliver, or join in the execution or delivery of any instruments required to effect a transfer of property contemplated by or necessary to effectuate this Combined Disclosure Statement and Plan, and to perform any other act that is necessary for the consummation of this Combined Disclosure Statement and Plan, pursuant to section 1142(b) of the Bankruptcy Code.

9.    <u>Title to Accounts.</u>  Title to all of the Debtor's bank, brokerage and other accounts shall vest in the Post-Effective Date Debtor, effective as of the Effective Date, without any further Order of the Bankruptcy Court or further action on the part of any Person or Entity.  On and after the Effective Date, all such accounts shall be deemed to be accounts in the name of the Post-Effective Date Debtor without any further action by any Person or Entity or any further Order of the Bankruptcy Court.

10.    <u>Corporate Documents and Corporate Authority</u>.   On the Effective Date, the certificates of incorporation, bylaws, and articles of organization, as applicable, of the Debtor shall be deemed amended to the extent necessary to carry out the provisions of this Combined Disclosure Statement and Plan.  The entry of the Confirmation Order shall constitute authorization for the Debtor or the Plan Administrator, as applicable, to take or cause to be taken all actions necessary or appropriate to implement all provisions of, and to consummate, this Combined Disclosure Statement and Plan prior to, on, and after the Effective Date and all such actions taken or caused to be taken shall be deemed to have been authorized and approved by the Bankruptcy Court without further approval, act, or action under any applicable law, order, rule, or regulation. Effective as of the Effective Date, all directors, managers, members, and officers of the Debtor shall be discharged, and all such appointments rescinded for all purposes, without any necessity of taking any further action in connection therewith.

11.    <u>Exemption from Certain Taxes</u>.  To the fullest extent permitted by section 1146(a) of the Bankruptcy Code, any transfers of property pursuant hereto shall not be subject to any stamp tax, recording tax, personal property tax, real estate transfer tax, sales tax, use tax, privilege tax, or other similar tax or governmental assessment in the United States, and the Confirmation Order shall direct and be deemed to direct the appropriate federal, state or local government officials or agents to forgo the collection of any such tax or governmental assessment and to accept for filing and recordation instruments or other documents pursuant to such transfers of property without the payment of any such tax or governmental assessment.  Such exemption specifically applies, without limitation, to (1) the creation of any mortgage, deed of trust, lien or other security interest; (2) the assuming and assigning any contract, lease or sublease; (3) any transaction authorized by this Combined Disclosure Statement and Plan; (4) any sale of an Asset by the Plan Administrator in furtherance of this Combined Disclosure Statement and Plan, including but not limited to any sale of personal or real property; and (5) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with this Combined Disclosure Statement and Plan.

## X.    PROVISIONS REGARDING THE PLAN ADMINISTRATOR

### A.    Appointment of the Plan Administrator

On the Effective Date, the Plan Administrator selected by the Debtor shall be appointed and thereafter serve in accordance with this Combined Disclosure Statement and Plan, including to wind down the Post-Effective Date Debtor. The Plan Administrator shall not be required to give any bond or surety or other security for the performance of its duties unless otherwise ordered by the Bankruptcy Court. As part of the Plan Supplement, the Debtor will identify the Plan Administrator and the terms of the Plan Administrator's compensation.

### B.    Rights and Powers of the Plan Administrator

The Plan Administrator shall act for the Post-Effective Date Debtor in the same fiduciary capacity as applicable to the board of directors, subject to the provisions hereof (and all certificates of formation and related documents are deemed amended by this Combined Disclosure Statement and Plan to permit and authorize same). From and after the Effective Date, the Plan Administrator shall be the sole representative of, and shall act for, the Post-Effective Date Debtor. In addition to any powers and authority specifically set forth in other provisions of this Combined Disclosure Statement and Plan, the Plan Administrator shall be empowered to (i) effect all actions and execute all agreements, instruments and other documents necessary to perform its duties under this Combined Disclosure Statement and Plan, (ii) establish, as necessary, disbursement accounts for the deposit and Distribution of all amounts distributed under this Combined Disclosure Statement and Plan, (iii) make Distributions in accordance with this Combined Disclosure Statement and Plan, (iv) object to Claims, as appropriate, (v) employ and compensate professionals to represent it with respect to its responsibilities, (vi) assert any of the Debtor's claims, Causes of Action, rights of setoff, or other legal or equitable defenses, and (vii) exercise such other powers as may be vested in the Plan Administrator by Order of the Bankruptcy Court, pursuant to this Combined Disclosure Statement and Plan, or as deemed by the Plan Administrator to be necessary and proper to implement the provisions hereof.

The Plan Administrator may take any and all actions which it deems reasonably necessary or appropriate to defend against any Claim, including, without limitation, the right to: (a) exercise any and all judgment and discretion with respect to the manner in which to defend against or settle any Claim, including, without limitation, the retention of professionals, experts and consultants; and (b) enter into a settlement agreement or agreements without Bankruptcy Court approval. Upon the Effective Date and the appointment of the Plan Administrator, the Debtor shall no longer have any officers, directors, or managers, all of whom shall be removed from office without the need for any further action, consent, or formal resignation process.

### C.    Post-Effective Date Expenses of the Plan Administrator

The Plan Administrator shall receive reasonable compensation for services rendered pursuant to this Combined Disclosure Statement and Plan without further Bankruptcy Court Order. In addition, the amount of reasonable fees, costs, and expenses of the Plan Administrator on or after the Effective Date (including, without limitation, reasonable attorney and professional fees and expenses) may be paid without further Bankruptcy Court Order. The Plan Administrator shall

37

be paid from any reserves set aside for such fees, costs, and expenses of the Plan Administrator, as further set forth in the Plan Administrator Agreement.  Any amounts remaining in the reserves shall be distributed in accordance with the provisions of this Combined Disclosure Statement and Plan.

**D.**     **Plan Administrator Agreement**

A form of the Plan Administrator Agreement shall be Filed as part of the Plan Supplement.

## XI.     PROVISIONS GOVERNING DISTRIBUTIONS UNDER THE COMBINED DISCLOSURE STATEMENT AND PLAN

**A.**     **Method of Payment**

Unless expressly agreed, in writing, all Cash payments to be made pursuant to this Combined Disclosure Statement and Plan shall be made by check drawn on a domestic bank or by an electronic wire transfer.

**B.**     **Objections to and Resolution of Claims and Existing Equity Interests**

Following the Effective Date, the Plan Administrator shall have the right to File objections and/or motions to estimate any and all Claims or Existing Equity Interests.  The Plan Administrator shall have the authority to compromise, settle, otherwise resolve, or withdraw any objections, without approval of the Bankruptcy Court.  The Plan Administrator shall further have the authority to resolve and settle any and all Claims or Existing Equity Interests without approval of the Bankruptcy Court.

The Bankruptcy Court shall retain jurisdiction to estimate any such Claim or Existing Equity Interest, including during the litigation of any objection to such Claim or Existing Equity Interest, or during the appeal relating to such objection.  In the event that the Bankruptcy Court estimates any contingent or unliquidated Claim or Existing Equity Interest, that estimated amount shall constitute a maximum limitation on such Claim or Existing Equity Interest for all purposes under this Combined Disclosure Statement and Plan (including for purposes of Distributions), and the Plan Administrator may elect to pursue any supplemental proceedings to object to any ultimate Distribution on such Claim or Existing Equity Interest.

**C.**     **Claims or Existing Equity Interests Objection Deadline**

Except as otherwise set forth in Articles V.B and V.D above with respect to Administrative Expense Claims and Professional Fee Claims, the Plan Administrator, and any other party in interest to the extent permitted pursuant to section 502(a) of the Bankruptcy Code, shall File and serve any objection to any Claims or Existing Equity Interests no later than the Claims or Existing Equity Interests Objection Deadline; *provided*, *however*, the Claims or Existing Equity Interests Objection Deadline may be extended by the Bankruptcy Court from time to time upon motion and notice by the Plan Administrator.

**D.**     **No Distribution Pending Allowance**

Notwithstanding any other provision of this Combined Disclosure Statement and Plan, no payment or Distribution of Cash or other property shall be made with respect to any portion of a Disputed Claim or Existing Equity Interest unless and until all objections to such Claim or Existing Equity Interest are resolved by Final Order or as otherwise permitted by this Combined Disclosure Statement and Plan.

**E.**      **Reserve for Disputed Claims or Disputed Existing Equity Interests**

On any date that Distributions are to be made under the terms of this Combined Disclosure Statement and Plan, the Plan Administrator shall reserve, in its discretion, (i) Cash or property equal to 100% of the Cash or property that would be distributed on such date on account of Disputed Claims or Disputed Existing Equity Interests as if each such Disputed Claim or Existing Equity Interest were an Allowed Claim or Existing Equity Interest but for the pendency of a dispute with respect thereto, or (ii) such other amount that the Plan Administrator estimates on account of the Disputed Claim or Existing Equity Interest. Such Cash or property, as the case may be, shall be held in trust for the benefit of the Holders of all such Disputed Claims or Disputed Existing Equity Interests pending determination of their entitlement thereto.

**F.**      **Timing of Distributions**

Unless otherwise provided herein, on each Distribution Date, each Holder of an Allowed Claim and Existing Equity Interest shall receive such Distributions that this Combined Disclosure Statement and Plan provide for Allowed Claims and Existing Equity Interests in accordance with Article XI.G hereof. In the event that any payment or act under this Combined Disclosure Statement and Plan is required to be made or performed on a date that is not a Business Day, then the making of such payment or the performance of such act may be completed on the next succeeding Business Day, but shall be deemed to have been completed as of the required date. The Plan Administrator shall have no obligation to recognize any transfer of Claims or Existing Equity Interests occurring on or after the Confirmation Date.

**G.**      **Delivery of Distributions**

1.      _Calculation of Distributions to Holders of Existing Equity Interests_. Distributions to Holders of Existing Equity Interests shall be made on a Pro Rata basis from the Net Distributable Assets, based on each Holder's respective interest in the Debtor as of the Petition Date, as reflected in the Debtor's stock ledger and, to the extent such Existing Equity Interests are held by The Depository Trust Company ("DTC"), based upon the records of DTC. The Plan Administrator shall be authorized to rely on the Debtor's books and records, including information provided by the Debtor's transfer agent and DTC, to determine the identity of Holders and the amount of their Allowed Existing Equity Interests.

2.      _Delivery of Distributions to Holders of Allowed Existing Equity Interests_. Distributions to registered Holders of Allowed Existing Equity Interests shall be made to the addresses reflected in the Debtor's stock ledger maintained by its transfer agent, unless such Holder provides updated delivery instructions to the Plan Administrator in writing and in accordance with the notice provision included in the Plan Administrator Agreement. Distributions to beneficial Holders of Allowed Existing Equity Interests held in "street name" through DTC

shall be made through DTC in accordance with customary practices.  The Plan Administrator shall coordinate with DTC and its participants to facilitate the delivery of Distributions to such Holders in exchange for such Allowed Existing Equity Interests, who shall receive their Pro Rata share of the Net Distributable Assets through their respective brokerage or custodial accounts.

3.      Delivery of Distributions to Holders of Allowed Claims.  Except as provided herein, Distributions to Holders of Allowed Claims shall be made: (i) at the addresses reflected on the Debtor's books and records as of the Petition Date;  (ii) at the addresses set forth in any written notices of address changes Filed prior to or as of the Effective Date; or (iii) at the address reflected in the Schedules.

4.      Returned Distributions.  If the Distribution to the Holder of any Allowed Claim or Existing Equity Interest is returned to the Plan Administrator as undeliverable, no further Distribution shall be made to such Holder unless and until the Plan Administrator is notified in writing of such Holder's then-current address.   Undeliverable Distributions shall remain in the possession of the Plan Administrator until the earlier of (i) such time as a Distribution becomes deliverable or (ii) such undeliverable Distribution becomes an Unclaimed Distribution.  The Plan Administrator shall make reasonable efforts to update or correct contact information for recipients of undeliverable Distributions; *provided*, *however*, nothing contained in this Combined Disclosure Statement and Plan shall require the Plan Administrator to locate any Holder of an Allowed Claim or Existing Equity Interest.

## H.      **Unclaimed Distributions**

Any Cash or other property to be distributed under this Combined Disclosure Statement and Plan shall revert to the Plan Administrator if it is not claimed by the Person or Entity on or before the Unclaimed Distribution Deadline.  If such Cash or other property is not claimed on or before the Unclaimed Distribution Deadline, the Distribution made to such Person or Entity shall be deemed to be reduced to zero and such Distributions shall be immediately deemed unclaimed property under section 347(b) of the Bankruptcy Code.  After such date, all unclaimed property or interests in property shall revert to the Plan Administrator automatically and without need for a further Order by the Bankruptcy Court (notwithstanding any applicable federal, provincial, or state escheat, abandoned, or unclaimed property laws to the contrary), and the Claim of any Holder to such property or Equity Interest in property shall be forever barred.  For the avoidance of doubt, in the event of multiple Distributions, a Person or Entity may be entitled to subsequent Distributions if it claims the distributed Cash or other property by the subsequent Unclaimed Distribution Deadline, even if it fails to claim certain Cash or other property distributed to it on or before the prior Unclaimed Distribution Deadline.

## I.      ***De Minimis* Distributions**

If the amount of Cash to be distributed on the initial Distribution Date to the Holder of an Allowed Claim or Existing Equity Interest in a Class is less than $50.00, the Plan Administrator may hold such Cash until the aggregate amount of Cash to be distributed to such Holder is in an amount equal to or greater than $50.00.  Notwithstanding the preceding sentence, if the aggregate amount of Cash to be distributed to the Holder never equals or exceeds $50.00, then the Plan Administrator shall not distribute Cash to such Holder.  Any such Holder of an Allowed Claim or

Existing Equity Interest on account of which the amount of Cash to be distributed is less than $50.00 in the aggregate will be forever barred from asserting its Claim or Equity Interest for such Distribution against the Plan Administrator or its property.  Any Cash not distributed pursuant to this Article XI of this Combined Disclosure Statement and Plan will remain the property of the Post-Effective Date Debtor.

**J.      Setoff**

The Debtor or the Plan Administrator, as the case may be, retain the right, subject to any applicable notice provisions under applicable law, to reduce any Claim by way of setoff in accordance with the Debtor's books and records.

**K.      Postpetition Interest**

Interest shall not accrue on any prepetition Claims, and no Holder of a prepetition Claim shall be entitled to interest accruing on or after the Petition Date.  No prepetition Claim shall be Allowed to the extent it is for postpetition interest or other similar charges, except to the extent permitted for Holders of Secured Claims under section 506(b) of the Bankruptcy Code.

**L.      Allocation of Distributions Between Principal and Interest**

For Distributions in respect of Allowed General Unsecured Claims, to the extent that any such Allowed Claim entitled to a Distribution under this Combined Disclosure Statement and Plan is comprised of indebtedness and accrued but unpaid interest thereon, such Distribution shall be allocated to the principal amount (as determined for federal income tax purposes) of the Claim first, and then to accrued but unpaid interest.

**M.      No Holder to Receive More than Payment in Full**

Notwithstanding any other provision hereof, no Holder of a Claim or Existing Equity Interest shall receive more than full payment of its applicable Allowed Claim or Existing Equity Interest, including any interest, costs or fees that may be payable with respect thereto under or pursuant to this Combined Disclosure Statement and Plan.

**N.      Compliance with Tax Requirements**

In connection with this Combined Disclosure Statement and Plan and all Distributions hereunder, to the extent applicable, the Plan Administrator is authorized to take any and all actions that may be necessary or appropriate to comply with all Tax withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority, and all Distributions pursuant to this Combined Disclosure Statement and Plan shall be subject to any such withholding and reporting requirements, as more fully set forth in Article XVI herein.

**O.      Remaining Available Cash**

If in connection with closing the Chapter 11 Case, the Cash remaining is less than $5,000.00 the Plan Administrator in its sole discretion may donate such amount to a 501(c)(3) charity of its choice.

## XII.   CONFIRMATION AND VOTING PROCEDURES

### A.   Confirmation Procedure

#### 1.   Confirmation Hearing

On [●], 2026, the Bankruptcy Court entered an Order [Docket No. [●]] (the "Procedures Order") (i) scheduling the Confirmation Hearing; (ii) approving the form and manner of service of the combined notice of the Confirmation Hearing and deadline to file objections to this Combined Disclosure Statement and Plan (the "Combined Notice") and notice of non-voting status (the "Notice of Non-Voting Status"); (iii) establishing the deadline to file objections to approval and confirmation of this Combined Disclosure Statement and Plan; (iv) finding that solicitation of this Combined Disclosure Statement and Plan is not necessary; and (v) granting related relief.

The Confirmation Hearing has been scheduled for [●], 2026 at [·]:00 [a.m./p.m.], prevailing Eastern Time, at the Bankruptcy Court, 824 North Market Street, 3rd Floor, Courtroom 5, Wilmington, Delaware 19801 to consider (i) approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and (ii) confirmation of this Combined Disclosure Statement and Plan pursuant to section 1129 of the Bankruptcy Code.  The Confirmation Hearing may be adjourned from time to time by the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing or by Filing a notice on the Docket.

#### 2.   Procedure for Objections

Any objection to approval of this Combined Disclosure Statement and Plan as providing adequate information pursuant to section 1125 of the Bankruptcy Code and/or confirmation of this Combined Disclosure Statement and Plan must be made in writing and Filed with the Bankruptcy Court and served on (a) the Debtor's counsel, (i) Richards, Layton & Finger, P.A., One Rodney Square, 920 N. King Street, Wilmington, DE 19801 (Attn: Daniel J. DeFranceschi (defranceschi@rlf.com), Michael J. Merchant (merchant@rlf.com), and Alexander R. Steiger (steiger@rlf.com)) and (ii) Cooley LLP, 55 Hudson Yards, New York, NY 10001 (Attn: Daniel Shamah (dshamah@cooley.com), Lauren A. Reichardt (lreichardt@cooley.com), Olya Antle (oantle@cooley.com), and Miriam Peguero Medrano (mpegueromedrano@cooley.com)); and (b) the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Suite 2207, Lockbox 35, Wilmington, DE 19801 (Attn: Jane M. Leamy (jane.m.leamy@usdoj.gov)), in each case, by no later than [●]**, 2026 at 4:00 p.m., prevailing Eastern Time.  Unless an objection is timely Filed and served, it may not be considered by the Bankruptcy Court at the Confirmation Hearing.**

#### 3.   Elimination of Vacant Classes

Any Class of Claims or Equity Interests that does not contain, as of the date of commencement of the Confirmation Hearing, a Holder of an Allowed Claim or Existing Equity Interest, or a Holder of a Claim temporarily Allowed under Bankruptcy Rule 3018, shall be deemed deleted from this Combined Disclosure Statement and Plan for all purposes, including for purposes of determining acceptance of this Combined Disclosure Statement and Plan by such Class under

section 1129(a)(8) of the Bankruptcy Code.

## B.    Statutory Requirements for Confirmation

The Bankruptcy Court will confirm this Combined Disclosure Statement and Plan only if it meets all the applicable requirements of section 1129 of the Bankruptcy Code.  Among other requirements, this Combined Disclosure Statement and Plan (i) must be accepted by all Impaired Classes of Claims and Equity Interests or, if rejected by an Impaired Class, this Combined Disclosure Statement and Plan must not "discriminate unfairly" against and be "fair and equitable" with respect to such Class; and (ii) must be feasible.  The Bankruptcy Court must also find that:

a.    this Combined Disclosure Statement and Plan has classified Claims and Equity Interests in a permissible manner;

b.    this Combined Disclosure Statement and Plan complies with the technical requirements of chapter 11 of the Bankruptcy Code; and

c.    this Combined Disclosure Statement and Plan has been proposed in good faith.

### 1.    Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code requires this Combined Disclosure Statement and Plan to place a Claim or Equity Interest in a particular Class only if such Claim or Equity Interest is substantially similar to the other Claims or Equity Interests in such Class.  This Combined Disclosure Statement and Plan creates separate Classes to deal respectively with Secured Claims, unsecured Claims and Equity Interests.  The Debtor believes that this Combined Disclosure Statement and Plan's classifications place substantially similar Claims or Equity Interests in the same Class and thus meet the requirements of section 1122 of the Bankruptcy Code.

### 2.    Best Interests of Creditors Test

Section 1129(a)(7) of the Bankruptcy Code requires that each Holder of an Impaired Claim or Equity Interest either (i) accept this Combined Disclosure Statement and Plan or (ii) receive or retain under this Combined Disclosure Statement and Plan property of a value, as of the Effective Date, that is not less than the value such Holder would receive if the Debtor was liquidated under chapter 7 of the Bankruptcy Code.  The Debtor believes that anticipated recoveries to the Holders of Existing Equity Interests under this Combined Disclosure Statement and Plan evidences a greater or equal recovery than the recovery available in a chapter 7 liquidation.

To calculate the probable distribution to Holders of each Impaired Class of Claims and Equity Interests if the Debtor was liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the Debtor's Assets if the Chapter 11 Case was converted to a chapter 7 case under the Bankruptcy Code.  Because this Combined Disclosure Statement and Plan is a liquidating plan, the "liquidation value" in the hypothetical chapter 7 liquidation analysis for purposes of the "best interests" test is substantially similar to the estimates of the results of the chapter 11 liquidation contemplated by this Combined Disclosure Statement and Plan.  The Debtor believes, however, that in a chapter 7 liquidation,

there would be additional costs and expenses that would be incurred as a result of the ineffectiveness associated with replacing existing management and professionals in a chapter 7 case.

To make these findings, the Bankruptcy Court must (a) estimate the Cash liquidation proceeds that a chapter 7 trustee would generate if the Chapter 11 Case was converted to a chapter 7 case and the Debtor's Assets were liquidated; (b) determine the liquidation distribution that each non-accepting Holder of a Claim or Equity Interest would receive from such liquidation proceeds under the priority scheme dictated in chapter 7; and (c) compare such Holder's liquidation distribution to the distribution under this Combined Disclosure Statement and Plan that such Holder would receive if this Combined Disclosure Statement and Plan were confirmed and consummated.

Costs of liquidation under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee, as well as compensation of counsel and other professionals retained by the chapter 7 trustee, all unpaid expenses incurred by the Debtor in its Chapter 11 Case (such as compensation of attorneys, financial advisors and accountants that are allowed in the chapter 7 case), litigation costs, and claims arising from the operations of the Debtor during the pendency of the Chapter 11 Case. The "learning curve" that the chapter 7 trustee and new professionals would be faced due to their unfamiliarity with the Assets, the Debtor's business, and the Debtor's prepetition sale process comes with potentially additional costs to the Estate and with a delay compared to the time of Distributions under this Combined Disclosure Statement and Plan.

The Debtor believes that anticipated recoveries under this Combined Disclosure Statement and Plan evidence a greater or equal recovery to Holders of Claims or Existing Equity Interests in Impaired Classes than the recovery available in a chapter 7 liquidation.  Accordingly, the Debtor believes that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied.

3.    Voting on the Combined Disclosure Statement and Plan is Unnecessary

Section 1126 of the Bankruptcy Code provides that only the Holders of Claims in Classes Impaired by this Combined Disclosure Statement and Plan and receiving a payment or Distribution under this Combined Disclosure Statement and Plan may vote on this Combined Disclosure Statement and Plan. Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests may be Impaired if the plan alters the legal, equitable or contractual rights to which such claim or interest entitles the holder of such claim or interest. The Holders of Claims in Classes not Impaired by this Combined Disclosure Statement and Plan are deemed to accept this Combined Disclosure Statement and Plan, and do not have the right to vote on this Combined Disclosure Statement and Plan. The Holders of Claims or Existing Equity Interests in any Class whose interests will be cancelled under this Combined Disclosure Statement and Plan are deemed to reject this Combined Disclosure Statement and Plan, and do not have the right to vote on this Combined Disclosure Statement and Plan. Finally, the Holders of Claims or Existing Equity Interests whose Claims or Equity Interests are not classified under this Combined Disclosure Statement and Plan are not entitled to vote on this Combined Disclosure Statement and Plan.

Unless otherwise ordered by the Bankruptcy Court, all Classes of Claims are unimpaired under this Combined Disclosure Statement and Plan and no Classes of Claims are eligible to vote.

With regard to Classes of Equity Interests, the sole Class of Existing Equity Interests is Impaired and deemed to vote to reject this Combined Disclosure Statement and Plan. In connection with seeking entry of the Procedures Order, the Debtor has advised the Bankruptcy Court that it does not believe a solicitation process is necessary with respect to this Combined Disclosure Statement and Plan.

4. <u>Feasibility</u>

Section 1129(a)(11) of the Bankruptcy Code requires that confirmation of a plan not be likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtor or any successor to the Debtor (unless such liquidation or reorganization is proposed in the plan). Because this Combined Disclosure Statement and Plan proposes a liquidation of all of the Debtor's Assets, for purposes of this test, the Debtor has analyzed the ability of the Plan Administrator to meet its obligations under this Combined Disclosure Statement and Plan. Based on the Debtor's analysis, the Plan Administrator will have sufficient assets to accomplish its tasks under this Combined Disclosure Statement and Plan. Therefore, the Debtor believes that the liquidation pursuant to this Combined Disclosure Statement and Plan will meet the feasibility requirements of the Bankruptcy Code.

## XIII.   <u>CONDITIONS TO THE EFFECTIVE DATE</u>

### A.   <u>Conditions Precedent to the Effective Date</u>

The Combined Disclosure Statement and Plan shall not become effective unless and until the following conditions shall have been satisfied or waived:

1. The Confirmation Order shall have been entered and shall have become a Final Order.

2. All actions and all agreements, instruments, or other documents necessary to implement the terms and provisions of this Combined Disclosure Statement and Plan shall have been effected or executed and delivered, as applicable.

3. The Plan Administrator shall be duly appointed, qualified, and acting in that capacity.

4. The Professional Fee Reserve is funded pursuant to <u>Article V.D.2</u> of this Combined Disclosure Statement and Plan.

### B.   <u>Establishing the Effective Date</u>

The calendar date to serve as the Effective Date shall be a Business Day on or promptly following the satisfaction or waiver of all conditions to the Effective Date, which date will be selected by the Debtor.

On or within two (2) Business Days of the Effective Date, the Debtor shall File and serve a notice of occurrence of the Effective Date. Such notice shall contain, among other things, the Administrative Expense Bar Date, the deadline for Professionals to File and serve any Professional

Fee Claims, and the deadline to File a proof of Claim relating to damages from the rejection of any Executory Contract (including any Unexpired Lease) pursuant to the terms of this Combined Disclosure Statement and Plan.

## C.   <u>Effect of Failure of Conditions</u>

If each condition to the Effective Date has not been satisfied or duly waived within forty-five (45) days after the Confirmation Date, then upon motion by any party in interest, made before the time that each of the conditions has been satisfied or duly waived and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order may be vacated by the Bankruptcy Court; *provided*, *however*, that notwithstanding the Filing of such motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is either satisfied or duly waived by the Debtor before any Order granting such relief becomes a Final Order.  If the Confirmation Order is vacated pursuant to this section, this Combined Disclosure Statement and Plan shall be deemed null and void in all respects and nothing contained herein shall (A) constitute a waiver or release of any Claims by or against the Debtor, or (B) prejudice in any manner the rights of the Debtor.

## D.   <u>Waiver of Conditions to Confirmation and Effective Date</u>

Each of the conditions to the Effective Date may be waived, in whole or in part, by the Debtor without notice or an Order of the Bankruptcy Court.

## XIV.   <u>EXCULPATION, RELEASES AND INJUNCTIONS</u>

**A.   <u>Exculpation</u>**.  The Exculpated Parties shall not have or incur, and are hereby released from, any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereafter arising in law, equity, or otherwise to one another or to any Holder of any Claim or Equity Interest, or any other party-in-interest, or any of their respective Related Parties, for any act or omission originating or occurring on or after the Petition Date through and including the Effective Date in connection with, relating to, or arising out of the Debtor (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Case, the negotiation, preparation, dissemination, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, the negotiation, preparation, Filing, and consummation of the Sale Transaction, the settlement of Claims or renegotiation of Executory Contracts, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be distributed under this Combined Disclosure Statement and Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or after the Petition Date through and including the Effective Date related or relating to the foregoing; provided, however, that the foregoing provisions shall not operate to waive or release any Claims or Causes of Action arising from an act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct or gross negligence of such applicable Exculpated Party.  Nothing herein (i) shall prevent any Exculpated Party from asserting as a defense to any claim of fraud, willful misconduct or gross negligence that they reasonably relied upon the advice of counsel with respect to their duties and

responsibilities under this Combined Disclosure Statement and Plan or otherwise or (ii) shall be construed as exculpating any Exculpated Party from any obligations that they have under or in connection with this Combined Disclosure Statement and Plan or the transactions contemplated in this Combined Disclosure Statement and Plan. The Exculpated Parties have, and upon completion of this Combined Disclosure Statement and Plan, shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the Distributions under this Combined Disclosure Statement and Plan and, therefore, are not, and on account of such Distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing such Distribution. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, and any other applicable laws, rules, or regulations protecting such Exculpated Parties from liability.

**B.** <u>**Releases by the Debtor.**</u> Effective as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtor, its Estate, and each of the Debtor's current and former Affiliates, successors, and assigns, including any successor to the Debtor or any Estate representative appointed or selected pursuant to section 1123(b)(3) of the Bankruptcy Code, including the Plan Administrator, shall be deemed to, completely, conclusively, absolutely, unconditionally, irrevocably and forever release, waive, void and extinguish the Released Parties from any claim, Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability whatsoever (including any derivative Claims or Causes of Action asserted or that may be asserted on behalf of the Debtor and its Estate), whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, for any act or omission in connection with, relating to, or arising out of the Debtor (including the management, ownership, or operation thereof, including as such entities existed prior to or after the Petition Date), the Chapter 11 Case, the negotiation, preparation, Filing, and consummation of the Sale Transaction, the negotiation, preparation, dissemination, and Filing of this Combined Disclosure Statement and Plan, the Filing of the Chapter 11 Case, the settlement of Claims or renegotiation of Executory Contracts, the pursuit of confirmation of this Combined Disclosure Statement and Plan, the consummation of this Combined Disclosure Statement and Plan, or the administration of this Combined Disclosure Statement and Plan or the property to be distributed under this Combined Disclosure Statement and Plan, or upon any other act or omission, transaction, agreement, event or other occurrence taking place on or before the Effective Date (including before the Petition Date) related or relating to the foregoing; *provided*, *however*, that the foregoing provisions shall not operate to waive or release any Claims or Causes of Action resulting from any act or omission that is judicially determined by a Final Order to have constituted actual fraud, willful misconduct, or gross negligence of such applicable Released Party. Nothing herein shall be construed as releasing any Released Party from any obligations that they have under or in connection with this Combined Disclosure Statement and Plan or the transactions contemplated in this Combined Disclosure Statement and Plan.

**C.** <u>**Injunctions Relating to Releases**</u>. Effective as of the Effective Date, all Persons and Entities and their respective Related Parties that hold, have held or may hold a Claim, Cause of Action, obligation, suit, judgment, damages, debt, right, remedy or liability of any nature whatsoever, that is released or exculpated pursuant to this Combined Disclosure Statement and Plan, shall be permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, against the Released Parties and the Exculpated Parties (to the extent of the exculpation

47

provided pursuant to this Combined Disclosure Statement and Plan) on account of or based on the subject matter of such released and exculpated claims, Claims, Causes of Action, obligations, suits, judgments, damages, debts, rights, remedies or liabilities, (i) commencing, conducting or continuing in any manner, directly or indirectly, any Claim, Cause of Action, suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum, (ii) enforcing, attaching (including, without limitation, any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order, (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any lien, (iv) setting off (except to the extent such setoff was timely asserted in a document Filed with the Bankruptcy Court explicitly preserving such setoff), seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to such Released Party or Exculpated Party under this Combined Disclosure Statement and Plan, and (v) commencing or continuing in any manner, in any place of any judicial, arbitration, or administrative proceeding in any forum, that does not comply with or is inconsistent with the provisions of this Combined Disclosure Statement and Plan or the Confirmation Order.

**D.** **Injunctions to Protect Estate Assets.** Except as expressly otherwise provided in this Combined Disclosure Statement and Plan, including Article XIV hereof, or to the extent necessary to enforce the terms and conditions of this Combined Disclosure Statement and Plan, the Confirmation Order or a separate Order of the Bankruptcy Court, all Persons and Entities who have held, hold or may hold Claims against or Equity Interests in the Debtor shall be permanently enjoined from taking any of the following actions against the Debtor (but solely to the extent such action is brought against the Debtor to directly or indirectly recover upon any Assets of the Estate, including, without limitation, any such Assets that vest in the Debtor or Post-Effective Date Debtor, as applicable, upon the Effective Date), the Debtor's Estate, the Debtor's successors, the Post-Effective Date Debtor, the Plan Administrator or any of their property on account of any such Claims or Equity Interests: (i) commencing or continuing, in any manner or in any place, any action, Cause of Action or other proceeding; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree or Order; (iii) creating, perfecting, or enforcing any Lien; (iv) asserting a setoff (except to the extent such setoff was timely asserted in a document Filed with the Bankruptcy Court explicitly preserving such setoff), right of subrogation, or recoupment of any kind against any debt, liability, or obligation due to the Debtor; and (v) commencing or continuing, in any manner or in any place, any action, Cause of Action, or other proceeding that does not comply with or is inconsistent with the provisions of this Combined Disclosure Statement and Plan.

## XV.   ALTERNATIVES TO CONFIRMATION OF THE COMBINED DISCLOSURE STATEMENT AND PLAN

The Debtor believes that this Combined Disclosure Statement and Plan affords the Holders of Claims and Equity Interests the potential for a better realization on the Debtor's Assets than a chapter 7 liquidation, and therefore, is in the best interests of such Holders. If, however, this Combined Disclosure Statement and Plan is not confirmed, the theoretical alternatives include (a) formulation of an alternative plan or plans of liquidation under chapter 11, or (b) liquidation of the Debtor under chapter 7 of the Bankruptcy Code.

If this Combined Disclosure Statement and Plan is not confirmed, the Debtor or certain other parties in interest could attempt to formulate a different plan. However, the additional costs of formulating a different plan—all of which would constitute additional Administrative Expense Claims—may be so significant that one or more parties in interest could request that the Chapter 11 Case be converted to a case under chapter 7 of the Bankruptcy Code. In a case under Chapter 7 of the Bankruptcy Code, a trustee would be appointed to liquidate the Assets of the Debtor. It is impossible to predict precisely how the proceeds of the liquidation would be distributed to the respective Holders of Claims and Existing Equity Interests against the Debtor. The Debtor believes that in a liquidation under Chapter 7 of the Bankruptcy Code, before Holders of Claims or Existing Equity Interests received any Distributions, additional administrative expenses involved in the appointment of a trustee and attorneys, accountants, and other professionals to assist such trustee, would cause a substantial diminution in the value of the Estate. The Assets available for Distribution to Holders of Claims and Existing Equity Interests would be reduced by such additional expenses. Accordingly, the Debtor believes that this Combined Disclosure Statement and Plan enables stakeholders to realize the best return under the circumstances.

## XVI.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES

### A.    Brief Overview and Disclosure

The following discussion is a summary of certain U.S. federal income tax consequences of the consummation of this Combined Disclosure Statement and Plan to the Debtor and to certain Holders of Claims. It is for general information purposes only and should not be relied upon for purposes of determining the specific tax consequences of this Combined Disclosure Statement and Plan with respect to a particular Holder of a Claim. This discussion is provided for information purposes and does not purport to be a complete analysis or listing of all potential tax considerations.

This summary is based on the Internal Revenue Code of 1986, as amended (the "IRC"), the U.S. Treasury Regulations promulgated thereunder (the "Treasury Regulations"), judicial decisions, revenue rulings, and revenue procedures of the U.S. Internal Revenue Service (the "IRS") and any other published administrative rules and pronouncements of the IRS, all as in effect on the date of this Combined Disclosure Statement and Plan and all of which are subject to change or differing interpretations of applicable tax law may have retroactive effect and could significantly affect the U.S. federal income tax consequences described below. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been or will be obtained and the Debtor does not intend to seek a ruling from the IRS as to any of the tax consequences of this Combined Disclosure Statement and Plan discussed below. The discussion below is not binding upon the IRS or the courts. No assurance can be given that the IRS would not assert, or that a court would not sustain, a different position than any position discussed herein.

This summary does not address non-U.S., state, local, or non-income tax consequences of this Combined Disclosure Statement and Plan (including such consequences with respect to the Debtor, except to the limited extent noted below), nor does it purport to address all aspects of U.S. federal income taxation that may be relevant to a Holder in light of its individual circumstances or to a Holder that may be subject to special tax rules (such as persons who are related to the Debtor

within the meaning of the IRC, U.S. Holders (as defined below) whose functional currency is not the U.S. dollar, U.S. expatriates, certain former citizens or long-term residents of the United States, broker-dealers, banks, mutual funds, insurance companies, financial institutions, retirement plans, small business investment companies, regulated investment companies, real estate investment trusts, tax-exempt organizations, controlled foreign corporations, passive foreign investment companies, partnerships (or other entities treated as partnerships or other pass-through entities), beneficial owners of partnerships (or other entities treated as partnerships or other pass-through entities), subchapter S corporations, Holders of Claims as part of a straddle, hedge, conversion transaction, or other integrated investment, persons using a mark-to-market method of accounting, and Holders of Claims who are themselves in bankruptcy).  In addition, this summary does not address the alternative minimum tax or net investment income tax, U.S. federal estate and gift tax, or U.S. federal laws other than those pertaining to the U.S. federal income tax.  Furthermore, this summary assumes that a Holder of a Claim holds only Claims in a single Class and holds such a Claim only as a "capital asset" (within the meaning of section 1221 of the IRC).  This summary also assumes that the Claims against the Debtor will be respected for U.S. federal income tax purposes in accordance with their form, and that the Claims constitute interests in the Debtor "solely as a creditor" for purposes of section 897 of the IRC (and thus are not subject to withholding under the Foreign Investment in Real Property Tax Act).  This discussion does not address the U.S. federal income tax consequences to Holders (a) whose Claims are unimpaired or otherwise entitled to payment in full under this Combined Disclosure Statement and Plan, or (b) that are deemed to accept or deemed to reject this Combined Disclosure Statement and Plan, including Holders of Existing Equity Interests.  Additionally, this discussion does not address any consideration being received other than in a person's capacity as a Holder of a Claim.

For purposes of this discussion, the term "U.S. Holder" means a Holder of a Claim (including a beneficial owner of a Claim), that is, for U.S. federal income tax purposes, (i) an individual citizen or resident of the United States, (ii) a corporation, or other entity treated as a corporation, created or organized in or under the laws of the United States or any state thereof or the District of Columbia, (iii) a trust if (a) a court within the United States is able to exercise primary jurisdiction over the trust's administration and one or more U.S. persons (within the meaning of section 7701(a)(30) of the IRC) have the authority to control all substantial decisions of the trust or (b) such trust has made a valid election under applicable Treasury Regulations to be treated as a U.S. person for U.S. federal income tax purposes, or (iv) an estate, the income of which is includible in gross income for U.S. federal income tax purposes regardless of its source.

For purposes of this discussion, a "Non-U.S. Holder" is any Holder of a Claim that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes).  In the case of a Holder that is classified as a partnership for U.S. federal income tax purposes, the tax treatment of a partner generally will depend upon the status of the partner and the activities of the partner or the partnership.  If you are a partner (or other beneficial owner) of a partnership (or other entity treated as a partnership or other pass-through entity) that is, or will be, a Holder of a Claim, then you should consult your own tax advisors.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON**

**YOUR INDIVIDUAL CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE U.S. FEDERAL, STATE, LOCAL, NON-U.S., NON-INCOME, AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## B.    Consequences to the Debtor

The Sale Transaction may give rise to taxable income for the Debtor. The Debtor cannot guarantee that it has sufficient tax attributes, including NOLs, to avoid having a material Cash liability for federal income taxes, as this will depend, in part, on whether the Debtor has undergone (or will subsequently undergo) one or more "ownership changes" under section 382 of the IRC prior to the consummation of the Sale Transaction, and other factors and limitations (*e.g.*, the deductibility of NOLs incurred in taxable years beginning after 2017 is generally limited to 80% of the taxpayer's taxable income for a particular tax year). To the extent any Cash federal income tax liability arises in connection with the Sale Transaction, recoveries to Holders of Claims, and Existing Equity Interests could be reduced.

Under the IRC, a taxpayer generally recognizes cancellation of debt income ("CODI") to the extent that indebtedness of the taxpayer is satisfied for less than the amount owed by the taxpayer, subject to certain exceptions. The most significant of these exceptions with respect to the Debtor is that taxpayers who are operating under the jurisdiction of a federal bankruptcy court are not required to include CODI with respect to any indebtedness that is discharged pursuant to that federal bankruptcy proceeding (the "Bankruptcy Exception"). If the Bankruptcy Exception applies, however, the taxpayer must reduce its tax attributes, such as its NOLs, general business credits, capital loss carryforwards, and tax basis in assets, by the amount of the CODI avoided. In this case, the Debtor expects that it may recognize significant CODI from the implementation of this Combined Disclosure Statement and Plan and this CODI would result in a reduction in the Debtor's tax attributes. Because the total amount of CODI cannot be determined with certainty until this Combined Disclosure Statement and Plan is implemented, the Debtor is not able to project the extent to which its tax attributes would survive the implementation of this Combined Disclosure Statement and Plan. The liquidation of the Debtor would eliminate any remaining tax attributes.

## C.    Consequences to Certain U.S. Holders of Allowed Claims

### 1.    Consequences to Holders of Allowed General Unsecured Claims

A U.S. Holder of Allowed General Unsecured Claims that receives Cash will be treated as receiving payment in a taxable exchange under section 1001 of the IRC. Other than with respect to any amounts received that are attributable to accrued but untaxed interest (or original issue discount), each U.S. Holder of such Claims should recognize gain or loss equal to the difference between the (a) sum of the Cash received in exchange for the Claim, and (b) such U.S. Holder's adjusted basis, if any, in such Claim. A U.S. Holder's ability to deduct any loss recognized on the exchange of its Claims will depend on such U.S. Holder's own circumstances and may be restricted under the IRC.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE RECOGNITION OF GAIN OR LOSS, FOR FEDERAL INCOME TAX PURPOSES, ON THE SATISFACTION OF THEIR CLAIMS.**

2.    Accrued Interest and OID

A portion of the payment received by Holders of Allowed Claims may be attributable to accrued interest or original issue discount ("OID") on such Claims. Such amount should be taxable to that U.S. Holder as interest income if such accrued interest or OID has not been previously included in the Holder's gross income for United States federal income tax purposes. Conversely, U.S. Holders of Claims may be able to recognize a deductible loss to the extent any accrued interest or OID on the Claims was previously included in the U.S. Holder's gross income but was not paid in full by the Debtor.

If the payment does not fully satisfy all principal and interest or OID on Allowed Claims, the extent to which payment will be attributable to accrued interest or OID is unclear. Under this Combined Disclosure Statement and Plan, the aggregate consideration to be distributed to Holders of Allowed General Unsecured Claims will be allocated first to the principal amount of Allowed Claims, with any excess allocated to unpaid interest or OID that accrued on such Claims, if any. Certain legislative history indicates that an allocation of consideration as between principal and interest provided in a chapter 11 plan is binding for United States federal income tax purposes, while certain Treasury Regulations generally treat payments as allocated first to any accrued but unpaid interest or OID and then as a payment of principal. The IRS could take the position that the payment received by the U.S. Holder should be allocated in some way other than as provided in this Combined Disclosure Statement and Plan. U.S. Holders are urged to consult their tax advisors regarding the proper allocation of the consideration received by them in respect of their Claims.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED INTEREST.**

3.    Market Discount

Under the "market discount" provisions of the IRC, some or all of any gain realized by a U.S. Holder of a Claim who exchanges the Claim for an amount may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instruments constituting the exchanged Claim. In general, a debt instrument is considered to have been acquired with "market discount" if it is acquired other than on original issue and if its U.S. Holder's adjusted tax basis in the debt instrument is less than (i) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (ii) in the case of a debt instrument issued with original issue discount, its adjusted issue price plus original issue discount previously included by all Holders for periods before the acquisition of a Claim, in each case, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

52

Any gain recognized by a U.S. Holder on the taxable disposition of Allowed Claims (determined as described above) that were acquired with market discount should be treated as ordinary income to the extent of the market discount that accrued thereon while the Allowed Claims were considered to be held by the U.S. Holder (unless the U.S. Holder elected to include market discount in income as it accrued).

## D.     Matters Related to the Disputed Claims Reserve

The Debtor intends to create a reserve for Disputed Claims.  It is possible the Debtor will treat the reserve for Disputed Claims as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 (and make any appropriate elections).  In general, property that is subject to disputed ownership fund treatment is subject to taxation within the fund (either at C-corporation or trust rates, depending on the nature of the assets held by the fund).  Under disputed ownership fund treatment, a separate federal income tax return would be Filed with the IRS for the reserve for Disputed Claims with respect to any income attributable to the account, and any taxes imposed on the reserve for Disputed Claims or its Assets shall be paid out of the Assets of the reserve.

Although not free from doubt, U.S. Holders should not recognize any gain or loss when amounts are set aside in the reserve for Disputed Claims but should recognize gain or loss in an amount equal to: (i) the amount of Cash actually distributed to such U.S. Holder from the reserve, less (ii) the U.S. Holder's adjusted tax basis of its Claim when and to the extent Cash is actually distributed to such U.S. Holder.  The character of such gain or loss as capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the U.S. Holder, the nature of the Claim in such U.S. Holder's hands, whether the Claim was purchased at a discount, and whether and to what extent the U.S. Holder previously has claimed a bad debt deduction with respect to its Claim.  It is possible that the recognition of any loss realized by a U.S. Holder may be deferred until the reserve for Disputed Claims has made all payments to Holders of Disputed Claims.  U.S. Holders are urged to consult their tax advisors regarding the possible application (and the ability to elect out) of the "installment method" of reporting any gain that may be recognized by such Holders in respect of their Claims due to the receipt of Cash in a taxable year subsequent to the taxable year in which the reserve is established and the U.S. federal income tax consequences of having a beneficial interest in the reserve for Disputed Claims.  The discussion herein assumes that the installment method does not apply.

The timing of the inclusion of income may be subject to alteration for accrual method U.S. Holders that prepare "applicable financial statements" (as defined in section 451 of the IRC), which may require the inclusion of income no later than the time such amounts are reflected on such financial statement.

## E.     Certain U.S. Federal Income Tax Consequences to Non-U.S. Holders of Claims

The following discussion includes only certain U.S. federal income tax consequences of the payments to Non-U.S. Holders for Claims.  The discussion does not include any non-U.S. tax considerations.  The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Each Non-U.S. Holder should consult its own tax advisor regarding the U.S. federal, state, and local and the foreign tax consequences of the payments to such Non-U.S. Holder.

Whether a Non-U.S. Holder realizes gain or loss on the payment of a Claim and the amount of such gain or loss is generally determined in the same manner as set forth above for U.S. Holders.

1.    Gain Recognition

Any gain realized by a Non-U.S. Holder on the exchange of its Claim generally will not be subject to U.S. federal income taxation unless (i) the Non-U.S. Holder is an individual who was present in the United States for 183 days or more during the taxable year in which the exchange occurs and certain other conditions are met, or (ii) such gain is effectively connected with the conduct by such Non-U.S. Holder of a trade or business in the United States (and if an income tax treaty applies, such gain is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States).

If the first exception applies, to the extent that any gain is taxable, the Non-U.S. Holder generally will be subject to U.S. federal income tax at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty) on the amount by which such Non-U.S. Holder's gains allocable to U.S. sources exceed losses allocable to U.S. sources during the taxable year of the exchange.  If the second exception applies, the Non-U.S. Holder generally will be subject to U.S. federal income tax with respect to any gain realized on the exchange in the same manner as a U.S. Holder.  To claim an exemption from withholding tax, such Non-U.S. Holder will be required to provide a properly executed IRS Form W-8ECI (or such successor form as the IRS designates).  In addition, if such a Non-U.S. Holder is a corporation, it may be subject to a branch profits tax equal to 30 percent (or such lower rate provided by an applicable treaty) of its effectively connected earnings and profits for the taxable year, subject to certain adjustments.

2.    Accrued Interest

The United States generally imposes a 30% U.S. federal withholding tax on payments of interest to Non-U.S. Holders.  Subject to the discussion below of an interest effectively connected with the conduct of a trade or business within the United States, a Non-U.S. Holder will not be subject to the 30% U.S. federal withholding tax with respect to payments of interest on its Claim, provided that:

    i.     it does not own, actually or constructively, 10% or more of the total combined voting power of all classes of our stock entitled to vote;

    ii.     it is not a "controlled foreign corporation" with respect to which we are, directly or indirectly, a "related person"; and

    iii.     it provides its name and address, and certifies, under penalties of perjury, that it is not a U.S. person (on a properly executed IRS Form W-8BEN or W-8BEN-E (or other applicable form)), or it holds its Claim through certain foreign intermediaries and the foreign intermediaries satisfy the certification requirements of applicable Treasury Regulations.

If you cannot satisfy the requirements described above, you will be subject to the 30% U.S. federal withholding tax with respect to payments of interest on your Claim, unless you provide us (or other applicable withholding agent) with a properly executed IRS Form W-8BEN or W-8BEN-

E or other applicable form claiming an exemption from or reduction in withholding under the benefit of an applicable U.S. income tax treaty.

If such interest is effectively connected with the conduct by the Non-U.S. Holder of a trade or business within the United States (and if an income tax treaty applies, such interest is attributable to a permanent establishment maintained by such Non-U.S. Holder in the United States), provided the Non-U.S. Holder provides a properly executed IRS Form W-8ECI (or successor form) to the withholding agent, the Non-U.S. Holder (x) generally will not be subject to withholding tax, but (y) will be subject to U.S. federal income tax in the same manner as a U.S. Holder (unless an applicable income tax treaty provides otherwise), and a Non-U.S. Holder that is a corporation for U.S. federal income tax purposes may also be subject to a branch profits tax with respect to such Non-U.S. Holder's effectively connected earnings and profits that are attributable to the accrued but untaxed interest at a rate of 30 percent (or at a reduced rate or exemption from tax under an applicable income tax treaty).

3.    <u>FATCA</u>

Under the Foreign Account Tax Compliance Act ("<u>FATCA</u>"), foreign financial institutions and certain other foreign entities must report certain information with respect to their U.S. account holders and investors or be subject to withholding on the receipt of "withholdable payments." For this purpose, "withholdable payments" are generally U.S.-sourced payments of interest on certain types of obligations. FATCA withholding may apply even if the applicable payment would not otherwise be subject to U.S. federal nonresident withholding tax. U.S. Holders that hold Claims through foreign financial institutions and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of these rules on their Claim.

**F.    <u>Information Reporting and Backup Withholding</u>**

Information reporting requirements may apply to payments under this Combined Disclosure Statement and Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 24%) with respect to payments made pursuant to this Combined Disclosure Statement and Plan unless that Holder: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) timely provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding (generally in the form of a properly executed IRS Form W-9 for a U.S. Holder, and, for a Non-U.S. Holder, in the form of a properly executed applicable IRS Form W-8 (or otherwise establishes such Non-U.S. Holder's eligibility for an exemption)). Backup withholding is not an additional tax but is, instead, an advance payment that may be refunded to the extent it results in an overpayment of tax; *provided* that the required information is timely provided to the IRS.

The Debtor, or the applicable agent, will withhold all amounts required by law to be withheld from payments of interest and comply with all applicable information reporting requirements.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THIS COMBINED DISCLOSURE STATEMENT AND PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, OR FOREIGN TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XVII. RETENTION OF JURISDICTION

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, following the Effective Date, the Bankruptcy Court shall retain such jurisdiction over the Chapter 11 Case as is legally permissible, including, without limitation, such jurisdiction as is necessary to ensure that the interests and purposes of this Combined Disclosure Statement and Plan are carried out. The Bankruptcy Court shall have exclusive jurisdiction of all matters arising out of the Chapter 11 Case and this Combined Disclosure Statement and Plan pursuant to, and for the purposes of, sections 105(a) and 1142 of the Bankruptcy Code and for, among other things, the following purposes:

1. To hear and determine any objections to Claims or Existing Equity Interests, and to address any issues relating to Disputed Claims or Disputed Existing Equity Interests;

2. To enter and implement such Orders as may be appropriate in the event the Confirmation Order is for any reason stayed, revoked, modified or vacated;

3. To issue such Orders in aid of execution and consummation of this Combined Disclosure Statement and Plan, to the extent authorized by section 1142 of the Bankruptcy Code;

4. To consider any amendments to or modifications of this Combined Disclosure Statement and Plan, to cure any defect or omission, or reconcile any inconsistency in any Order of the Bankruptcy Court, including, without limitation, the Confirmation Order;

5. To hear and determine all requests for compensation and reimbursement of expenses under sections 330, 363, or 503 of the Bankruptcy Code;

6. To hear and determine disputes arising in connection with the interpretation, implementation or enforcement of this Combined Disclosure Statement and Plan;

7. To hear and determine matters concerning state, local and federal taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code (including, without limitation, any request by the Debtor or the Plan Administrator for an expedited determination of tax under section 505(b) of the Bankruptcy Code);

8. To hear any other matter not inconsistent with the Bankruptcy Code;

56

9.      To enter a final decree closing the Chapter 11 Case;

10.      To ensure that Distributions to Holders of Allowed Claims and Existing Equity Interests are accomplished pursuant to the provisions of this Combined Disclosure Statement and Plan;

11.      To decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and grant or deny any applications involving the Debtor that may be pending on the Effective Date;

12.      To issue injunctions, enter and implement other Orders or take such other actions as may be necessary or appropriate to restrain interference by any Person or Entity with the occurrence of the Effective Date or enforcement of this Combined Disclosure Statement and Plan, except as otherwise provided herein;

13.      To adjudicate, decide, or resolve any other matters that may arise in connection with or related to the Chapter 11 Case, Combined Disclosure Statement and Plan, the Confirmation Order or any contract, instrument, release, indenture, or other agreement or document created or implemented in connection with this Combined Disclosure Statement and Plan;

14.      To adjudicate, decide, or resolve any and all matters arising under the Purchase Agreement or other documents related to the Sale Transaction;

15.      To enforce, interpret, adjudicate, decide, or resolve any disputes arising in connection with any stipulations, orders, judgments, injunctions, exculpations, and rulings entered or granted in connection with the Chapter 11 Case (whether or not the Chapter 11 Case has been closed);

16.      To resolve disputes concerning any reserves with respect to Disputed Claims or Disputed Existing Equity Interests or the administration thereof;

17.      To resolve any cases, controversies, Causes of Action, suits, disputes, claims, or Claims that may arise in connection with this Combined Disclosure Statement and Plan, including the interpretation or enforcement of this Combined Disclosure Statement and Plan or any Entity's obligations incurred in connection with this Combined Disclosure Statement and Plan;

18.      To resolve any cases, controversies, Causes of Action, suits, disputes, claims, or Claims with respect to the settlements, compromises, releases, injunctions, exculpations, and other provisions contained in Article XIV of this Combined Disclosure Statement and Plan, including the scope thereof, and enter such Orders as may be necessary or appropriate to implement such releases, injunctions, exculpations, and other provisions;

19.      To enforce the settlements, compromises, releases, injunctions, exculpations, and other provisions set forth in Article XIV of this Combined Disclosure Statement and Plan;

20.      To resolve any disputes concerning whether a Person or Entity had sufficient notice of the Chapter 11 Case, the General Bar Date, the Governmental Bar Date, the Amended Schedules Bar Date, the Rejection Damages Bar Date, the Administrative Expense Bar Date, and/or the

57

conditional or final hearing on the approval of this Combined Disclosure Statement and Plan for the purpose of determining whether a Claim or Equity Interest is released, satisfied and/or enjoined hereunder or for any other purpose; and

21.    To resolve any other matter or for any purpose specified in this Combined Disclosure Statement and Plan, the Confirmation Order, or any other document entered into in connection with any of the foregoing.

## XVIII.  MISCELLANEOUS PROVISIONS

### A.    Books and Records

On the Effective Date, the Debtor's books and records that remain with the Estate as of the Effective Date shall be transferred to the Plan Administrator.  The Plan Administrator shall be free, in its discretion to abandon, destroy, or otherwise dispose of the books and records in compliance with applicable non-bankruptcy law at any time on and after the Effective Date, without the need for any other or further Order.

### B.    Termination of Injunctions or Stays

Unless otherwise provided herein or in the Confirmation Order, all injunctions or stays provided for in the Chapter 11 Case under sections 105 or 362 of the Bankruptcy Code or otherwise, and on the Confirmation Date, shall remain in full force and effect.

### C.    Amendment or Modification of this Combined Disclosure Statement and Plan

Alterations, amendments, or modifications of this Combined Disclosure Statement and Plan may be proposed in writing by the Debtor, at any time before the Confirmation Date; *provided that* this Combined Disclosure Statement and Plan, as altered, amended, or modified, satisfies the conditions of sections 1122 and 1123 of the Bankruptcy Code, and the Debtor shall have complied with section 1125 of the Bankruptcy Code.  Additionally, after the Confirmation Date, the Debtor may, upon Order of the Bankruptcy Court, amend or modify this Combined Disclosure Statement and Plan, in accordance with section 1127(b) of the Bankruptcy Code, remedy any defect or omission, or reconcile any inconsistency in this Combined Disclosure Statement and Plan in such manner as may be necessary to carry out the purpose and intent of this Combined Disclosure Statement and Plan consistent with the terms set forth herein.

### D.    Severability

In the event the Bankruptcy Court determines, before the Confirmation Date, that any provision in this Combined Disclosure Statement and Plan is invalid, void or unenforceable, such provision shall be invalid, void or unenforceable with respect to the Holder or Holders of such Claims or Equity Interest as to which the provision is determined to be invalid, void or unenforceable.  The invalidity, voidness or unenforceability of any such provision shall in no way limit or affect the enforceability and operative effect of any other provision of this Combined Disclosure Statement and Plan.

**E.**     **Revocation or Withdrawal of this Combined Disclosure Statement and Plan**

The Debtor reserves the right to revoke or withdraw this Combined Disclosure Statement and Plan before the Confirmation Date. If the Debtor revokes or withdraws this Combined Disclosure Statement and Plan before the Confirmation Date, then this Combined Disclosure Statement and Plan shall be deemed null and void. In such event, nothing contained herein shall constitute or be deemed a waiver or release of any Claims by or against the Debtor or Plan Administrator or to prejudice in any manner the rights of either the Debtor or Plan Administrator in any further proceedings involving the Debtor.

**F.**     **Binding Effect**

This Combined Disclosure Statement and Plan shall be binding upon and inure to the benefit of the Debtor, the Holders of Claims, and the Holders of Equity Interests, and their respective successors and assigns.

**G.**     **Notices**

All notices, requests and demands to or upon the Plan Administrator or the Debtor, as applicable, to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as shall be set forth in the notice of the Effective Date.

**H.**     **Governing Law**

Except to the extent the Bankruptcy Code, Bankruptcy Rules or other federal law is applicable, or to the extent an exhibit to this Combined Disclosure Statement and Plan provides otherwise, the rights and obligations arising under this Combined Disclosure Statement and Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Delaware, without giving effect to the principles of conflicts of law of such jurisdiction.

**I.**     **Withholding and Reporting Requirements**

In connection with the consummation of this Combined Disclosure Statement and Plan, the Debtor and Plan Administrator shall comply with all withholding and reporting requirements imposed by any federal, state, local or foreign taxing authority and all Distributions hereunder shall be subject to any such withholding and reporting requirements. Notwithstanding the above, each Holder of an Allowed Claim or Existing Equity Interest that is to receive a Distribution under this Combined Disclosure Statement and Plan shall have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed on such Holder by any Governmental Unit, including income, withholding and other tax obligations, on account of such Distribution. The Debtor and the Plan Administrator have the right, but not the obligation, to not make a Distribution until such Holder has made arrangements satisfactory to any disbursing party for payment of any such tax obligations. The Debtor or Plan Administrator may require, as a condition to receipt of a Distribution, that the Holder of an Allowed Claim or Existing Equity Interest complete and return an IRS Form W-8, W-9 or a similar tax form, as applicable to each such Holder. If the Debtor or Plan Administrator make such a request and the Holder fails to comply

before the date that is ninety (90) days after the request is made, such Holder shall be deemed to have forfeited rights to all Distributions and the amount of such forfeited Distributions shall irrevocably revert to the Debtor and any Claim in respect of such Distribution shall be disallowed and forever barred from assertion against the Debtor or its property.

**J.**      **2002 Service List**

After the Effective Date, any Entities or Persons that want to continue to receive notice in the Chapter 11 Case must File a renewed request to receive documents pursuant to Bankruptcy Rule 2002 no later than thirty (30) days after the Effective Date of this Combined Disclosure Statement and Plan; *provided*, *however*, that the United States Trustee shall be excused from this requirement and shall remain on the Bankruptcy Rule 2002 service list.  To the extent a renewed request is not timely Filed with the Bankruptcy Court, the Plan Administrator is authorized to limit notice and not include such Entities or Persons on any post-Effective Date Bankruptcy Rule 2002 service list.

**K.**      **Headings**

Headings are used in this Combined Disclosure Statement and Plan for convenience and reference only and shall not constitute a part of this Combined Disclosure Statement and Plan for any other purpose.

**L.**      **Exhibits/Schedules**

All exhibits and schedules to this Combined Disclosure Statement and Plan, including the Plan Supplement, are incorporated into and are a part of this Combined Disclosure Statement and Plan as if set forth in full herein.

**M.**      **Filing of Additional Documents**

On or before substantial consummation of this Combined Disclosure Statement and Plan, the Debtor shall File with the Bankruptcy Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Combined Disclosure Statement and Plan.

**N.**      **No Admissions**

Notwithstanding anything herein to the contrary, nothing contained in this Combined Disclosure Statement and Plan shall be deemed as an admission by any Entity with respect to any matter set forth herein.

**O.**      **Successors and Assigns**

The rights, benefits, and obligations of any Person or Entity named or referred to in this Combined Disclosure Statement and Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign of such Person or Entity.

P.     **Reservation of Rights**

    Except as expressly set forth herein, this Combined Disclosure Statement and Plan shall have no force or effect unless the Bankruptcy Court shall enter the Confirmation Order. None of the Filing of this Combined Disclosure Statement and Plan, any statement or provision contained herein, or the taking of any action by the Debtor with respect to this Combined Disclosure Statement and Plan shall be or shall be deemed to be an admission or waiver of any rights of the Debtor, Holders of Claims, or Existing Equity Interests before the Effective Date.

Q.     **Implementation**

    The Debtor shall take all steps, and execute all documents, including appropriate releases, necessary to effectuate the provisions contained in this Combined Disclosure Statement and Plan.

R.     **Inconsistency**

    In the event of any inconsistency among this Combined Disclosure Statement and Plan and any other instrument or document created or executed pursuant to this Combined Disclosure Statement and Plan, the provisions of this Combined Disclosure Statement and Plan shall govern.

S.     **Dissolution of Debtor**

    Upon the closing of the Chapter 11 Case, the Debtor shall be deemed dissolved under applicable law and the Plan Administrator, on behalf of the Debtor, is authorized to execute a certificate of dissolution and any required franchise tax reports and to File such certificate of dissolution and franchise tax reports with the Secretary of State of the State of Delaware.

T.     **Termination of the Plan Administrator**

    After the Chapter 11 Case is closed and the Plan Administrator has completed all of the tasks necessary in order to fully and completely wind down, dissolve, and/or terminate the Debtor and to otherwise comply with its obligations under the terms of this Combined Disclosure Statement and Plan, the Plan Administrator shall have fully completed its duties under this Combined Disclosure Statement and Plan and thereby shall be fully released and discharged of its duties and obligations to carry out the terms of this Combined Disclosure Statement and Plan.

U.     **Request for Expedited Determination of Taxes**

    The Debtor and the Plan Administrator shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns filed, or to be filed, for any and all taxable periods ending after the Petition Date through the Effective Date.

Dated:  January 5, 2026                          Clearside Biomedical, Inc.
        Wilmington, Delaware

                                               By: ___*/s/ George Lasezkay*_____
                                                     George Lasezkay
                                                     Chief Executive Officer

RLF1 34494424v.1